GROUP HEALTH INSURANCE OF NEW JERSEY, A NEW
JERSEY CORPORATION, APPELLANT, v. CHARLES R.
HOWELL, COMMISSIONER, DEPARTMENT OF BANKING
AND INSURANCE, STATE OF NEW JERSEY, AND
ARTHUR J. SILLS, ATTORNEY GENERAL OF THE
STATE OF NEW JERSEY, RESPONDENTS, AND MEDI-
CAL-SURGICAL PLAN OF NEW JERSEY (NEW JERSEY
BLUE SHIELD PLAN), A NEW JERSEY CORPORATION,
AND THE MEDICAL SOCIETY OF NEW JERSEY, A NEW
JERSEY CORPORATION, ADDITIONAL RESPONDENTS.

Argued May 5, 1964—Decided July 15, 1964.

*Mr. Irving Abramson,* of the New York Bar, argued the cause for the appellant (*Messrs. Kapelsohn, Lerner, Leuchter & Reitman,* attorneys; *Mr. Donald Grody,* of the New York Bar, on the brief).

*Mr. Alan B. Handler,* Deputy Attorney General, argued the cause for the respondents, Charles R. Howell, Commissioner, department of Banking and Insurance, State of New Jersey, and Arthur J. Sills, Attorney General of the State of New

Jersey (*Mr. Arthur J. Sills,* Attorney General of the State of New Jersey, attorney).

*Mr. William R. Vanderbilt* argued the cause for the additional respondent, Medical-Surgical Plan of New Jersey (*Messrs. Toner, Crowley, Woelper & Vanderbilt,* attorneys).

*Mr. Robert M. Backes* argued the cause for the additional respondent, The Medical Society of · New Jersey (*Messrs. Backes & Backes,* attorneys).

The opinion of the court was delivered by

PROCTOR, J. The present case is a continuation of *Group Health Ins. of N. J. v. Howell,* 40 *N. J.* 436 (1963). There we held that part of section 2 of the Medical Service Corporations Law (*N. J. S. A.* 17 :48A–2), which provided in effect that no person could be elected as a trustee of any medical service corporation unless his nomination had been approved by the Medical Society of New Jersey, violated the New Jersey Constitution because it placed legislative licensing power in the hands of a private organization which had an interest in promoting the welfare of Blue Shield, the only existing medical service corporation in the State. The validity of part of section 3 of that law (*N. J. S. A.* 17 :48A–3) was also challenged in the prior proceeding. Because the matter had been submitted on affidavits and because we felt that a more fully developed record was necessary to a proper determination of that issue, we remanded the matter to the Commissioner of Banking and Insurance for further proceedings and retained jurisdiction. Additional affidavits and testimony were submitted to the Commissioner, and the matter is again before us.

The challenged part of section 3 (*N. J. S. A.* 17 :48A–3) provides :

"The certicate of authority issued by the commissioner shall specify the county or counties in which the corporation may conduct its

business. Such certificate may be amended from time to time to include additional counties on the basis of qualification pursuant to the provisions of this act. No such certificate shall be issued to authorize a corporation to transact business in any county, or if issued, the authority with respect to such county shall be .cancelled by the commissioner, if he shall find that less than fifty-one per centum (51%) of the eligible physicians in any county are participating physicians."

The appellant contends that this provision is not reasonably related to any proper legislative objective. Respondents, on the other hand, contend that the provision serves the proper public purpose of insuring the availability of an adequate choice of participating physicians in those areas of the State wherein services might be sought by subscribers. The record on remand convinces us that this provision is not reasonably related to any proper legislative objective.

In our prior opinion we said that any person licensed to practice medicine and surgery in this State was an "eligible physician" within the meaning of section 3. 40 *N. J.*, at *p.* 455. And we asked that the record be developed to show how many licensed physicians were not engaged in the active practice of medicine and thus would not be available to render eligible services to subscribers. While the parties agree that many physicians are in this category, we still do not know their number with any degree of accuracy. We are told that the American Medical Association estimates that 12% of all licensed physicians are not actively engaged in the practice of medicine. In addition, the record indicates that many physicians, though they practice medicine, are employed by government agencies, the Armed Forces, laboratories, hospitals and other organizations and institutions which would not normally render services under medical service plans. Thus it is clear that the base upon which the 51% is to be calculated does include a substantial number of physicians who would be unavailable to service subscribers and yet would be "eligible" to contract as participating physicians and form part of the required 51%. This would indicate that, depending on the

ratio of available eligibles (as we shall term them) to unavailable eligibles within a county, the applicant could comply with the statute by filling his roster to a substantial degree with unavailable eligible physicians. Certainly, to the extent that this is possible, the legislative purpose of assuring an adequate choice of available physicians would not be achieved.

Moreover, if the purpose of the Legislature, as suggested, was to provide an adequate choice of available physicians to subscribers, realistically those physicians must not only be engaged in the active practice of medicine but should be available to render services of the types covered by the plan's subscription contracts. Since the statute permits plans which limit the types of medical services to be offered subscribers (*N. J. S. A.* 17:48A-1 and 17:48A-6(b)),[1] the base group should be related to those practitioners who can render the eligible services covered by the plan. Obviously, a base group which includes general practitioners and physicians who are primarily engaged in specialties such as psychiatry, ophthalmology, or pediatrics, for example, would not be reasonably related to providing an adequate choice of physicians to service a plan which limited its coverage to in-hospital surgical procedures.

This lack of relationship appearing in the original enactment has been both aggravated and spotlighted by recent supplements to the law which apparently add to the base of "eligibles" all licensed dentists (*L.* 1964, *c.* 1; *N. J. S. A.* 17:48A-28) and all duly registered bio-analytical laboratories (*L.* 1963, *c.* 158; *N. J. S. A.* 17:48A-27), within the scope of their respective fields. A similar supplement in 1953 added chiropodists to the original base of licensed physicians and surgeons (*L.* 1953, *c.* 283; *N. J. S. A.* 17:48A-26), and chiropodists are included as eligible and participating physicians by Blue Shield. These statutory supplements clearly

---

[1] In fact, the Blue Shield plan limits the medical services offered to subscribers.

contemplate that, at least in a comprehensive medical plan, dentists and bio-analytical laboratories as well as chiropodists may sign participation agreements with plans, and thus they would seem to be "eligible physicians" within the meaning of section 3. Under *N. J. S. A.* 17:48A–28 only eligible services rendered by a licensed dentist *in an approved hospital* are within the scope of the act. In a comprehensive medical-service plan, it is inconceivable that the large increase in the statutory base due to the addition of all licensed dentists would ever be reasonably related to the minimal percentage of total claims which would be filed for such services. The distortion of the statutory base and the consequent lessening of reasonable relationship to the suggested statutory purpose is evident.

The lack of reasonable relationship is further demonstrated by the variation in the ratio of county population to physicians throughout the State. A chart submitted by Blue Shield indicates, for example, that the ratio varies from 1,290 to 1 in Warren County to 552 to 1 in Essex County.[2] Thus if 51% of the physicians in Warren County would provide an adequate choice, the statutory requirement of the same percentage in Essex County would seem unnecessarily high and not reasonably related to public need in that county. On the other hand, if 51% of the physicians in Essex County are needed for an adequate choice, to provide comparable benefits in Warren County, virtually all physicians in that county should be enrolled. In short, the ratio of physicians to the population varies so widely from county to county that a rigid requirement of 51% in every county must in practice result in inadequacy in some counties, superabundance in others, and, in sum, a lack of reasonable relation to the suggested purpose of an adequate choice in all counties. Moreover, if we ignore the ratio of physicians to population and

[2] We have accepted for purposes of example the figures of eligible physicians compiled by Blue Shield.

look at the number of eligible physicians in these two counties, the statute would require 51% of Warren County's 49 eligible physicians, or 25, and 51% of Essex County's 1,673 physicians, or 853, without regard to the number of subscribers enrolled or likely to become enrolled in a plan in either county.

Two other factors also contribute to the lack of reasonable relationship demonstrated above. First, county lines, while perhaps a *prima facie* reasonable division of the State for the purposes of the statute, do not clearly define the areas in which subscribers would seek eligible services. Although the record indicates that most physicians practice in the county in which they reside and that most patients seek medical services in the county of their residence, there is a substantial crossing of county lines by both patients and physicians, particularly where larger cities are close to county lines. But of more significance under the statutory scheme is the fact that the groups (*e. g.*, industrial employees, labor unions) which are solicited by medical service plans are frequently composed of residents of several counties. The participation of 51% of the doctors in the county where the group contracts with the plan does not achieve the objective of providing to the members of the group who reside outside that county service benefits in the area where they are most likely to seek them. Secondly, under section 3 the authority of the plan to continue to transact business in any county must be cancelled if the number of participating physicians falls below the required 51%. Thus, the mobility of doctors in and out of a county could determine the life and death of a plan, whether or not the feasibility of the plan is in any way affected by the shift in physician population. For example, in the less populous counties where the number of physicians is as low as 49, an increase of one or two doctors in the county might prevent a medical service corporation from continuing to transact business regardless of the effect of the entry on the work-

ability of its plan and regardless of the availability of the new doctors to service its subscribers.

For the foregoing reasons we conclude that the requirement of section 3 of 51% physician participation for all plans in all counties is not reasonably related to the suggested statutory objective of assuring an adequate choice of physicians to service subscribers in the area in which they are most likely to seek medical care.

Aside from its lack of reasonable relationship to proper statutory objectives, the unreasonableness of the statutory requirement is further indicated by the difficulty of determining the number of eligible physicians in any county. It is undisputed that no public records are available from which an applicant can accurately determine the number of eligible physicians residing or practicing in any county. Nor does the Commissioner have the necessary information. Following the remand, the Commissioner asked Blue Shield to advise him how it determined the number of eligible physicians in a county. The response of Blue Shield shows patent inadequacies in its procedures for determining compliance. For example, Blue Shield does not incorporate into its list of eligibles the newly licensed physicians (over 500 a year), as reported by the State Board of Medical Examiners, until a physician either files a claim for eligible services or requests to be enrolled. It advised the Commissioner that to do so would distort its records "since the majority of them would, in all probability, seldom have occasion to submit a claim." Of course, the statutory category of "eligible physicians" does not exclude physicians merely because they would be unlikely to file a claim with Blue Shield. We sympathize with the practical difficulty presented by the fact that many of the newly licensed physicians may shortly thereafter leave the State and at that time become ineligible, since they are no longer "in any county." But it is just this mobility of the profession, added to the inadequacies of public records, that makes it unreasonably difficult, if not impossible, for an appli-

cant to show compliance with the 51% requirement or, perhaps more important, to show continuing compliance. A regulation which in practice is illusory or impossible to comply with is arbitrary and oppressive and would violate due process. *Cf. Pennsylvania Railroad Co. v. Dept. of Public Utilities,* 14 *N. J.* 411, 435 (1954). See II *Cooley, Constitutional Limitations,* 1228 (*8th ed.* 1927).

Moreover, this lack of reasonable relation between the requirement and its suggested purpose indicates that the challenged provision constitutes in effect an improper delegation of legislative licensing power to private persons. Such a delegation is further demonstrated by the following factors. The 51% requirement is an odd one. The choice of this particular figure—a bare majority—looks more like an improper delegation than it does like a provision to assure an adequate choice of participating physicians to subscribers. The choice of 51% suggests that the physicians of any county have been given power to decide by majority vote whether any such plan should be allowed to operate in their county, whether any physicians should be allowed to participate in it, and, after one plan is operating there, whether any other plan should be allowed to come into the county and compete with the plan with which they are already aligned. Also, the history of the statute, which was sponsored by the Medical Society, shows that the Society intended that it, or physicians, should control any plan operated in New Jersey. This was made perfectly clear by the invalid provision in section 2 that required Medical Society approval of nominees for trustees of all medical service corporations. 40 *N. J.*, at *pp.* 445–447. Further, the Medical Society has announced that it disapproves of its members' participating in plans which are not physician-controlled and whose contractual provisions, schedules of benefits, and income limits have not been approved by the Medical Society. Section 2 would permit the State Medical Society to exercise a veto over the entrance of medical service corporations into the State; and section 3 would give a veto

power to less than half of the physicians at the county level. (As a practical matter, this operates as a delegation to the county medical societies, the component units of the State Society, to which over 90% of all licensed physicians belong.) Both sections 2 and 3 are methods of insuring that plans which do not meet the approval of the Medical Society and a majority of physicians in each county will not be able to operate. The relationship of section 2 and section 3 in the statutory scheme and in practical effect is too close to be overlooked. When read together they show clearly an attempt to delegate to private persons the power to decide whether a particular medical service corporation shall be authorized to transact business in any county. The delegation does not relate to competency of medical services to be rendered or to standards of medical performance. Rather, it is in effect a grant of power to approve or disapprove the services and fees which willing physicians and willing subscribers wish to agree to.

For the above reasons we conclude that the challenged part of section 3 of the Medical Service Corporations Law (*N. J. S. A.* 17:48A–3) violates *Art.* I, *par.* 1, and *Art.* IV, § 1, *par.* 1 of the New Jersey *Constitution of* 1947 and the Fourteenth Amendment of the Federal *Constitution.* See *Illinois Hospital Service, Inc. v. Gerber,* 18 *Ill.* 2d 531, 165 *N. E.* 2d 279 (*Sup. Ct.* 1960), and the discussion of that case in our prior opinion, 40 *N. J.,* at *pp.* 452–454; see also Note, "The State Courts and Delegation of Public Authority to Private Groups," 67 *Harv. L. Rev.* 1398 (1954). *Cf. Carter v. Carter Coal Co.,* 298 *U. S.* 238, 56 *S. Ct.* 855, 80 *L. Ed.* 1160 (1936).

We have not arrived at our conclusion without considering the important and proper public purpose of assuring that full service benefits will be available to subscribers. This purpose can be achieved under the present statute which gives the Commissioner broad powers to supervise a medical service corporation so that its "condition or methods of operation are

not such as would render its operations hazardous to the public or its subscribers." *N. J. S. A.* 17:48A–3, 17:48A–9, 17:48A–10, 17:48A–15 to 20. The variations that exist in services offered from plan to plan and in the numbers and kinds of "eligible physicians" from county to county indicate that the number of participating physicians reasonably necessary to service any particular plan should be determined on a case-by-case basis. Before issuing a certificate of authority, the Commissioner will no doubt determine whether the extent of participation of physicians is adequate in view of the proposed methods of operation of the applicant corporation. Of course, by requiring participating physicians, he would not be delegating licensing power to private persons. If his requirement did not exceed the number of doctors necessary to make a particular plan feasible and workable in the public interest, licensing power would not be delegated to doctors as a group or individually. In such circumstances doctors are similar to necessary capital, without which the plan is not feasible in the public interest. Improper delegation occurs only when doctors whose participation in the plan is not reasonably required are given the power to determine whether a plan otherwise feasible and operable should be allowed to transact business. So long as the number of required participating physicians is determined by considering the reasonable needs of the subscribers and the public with respect to the particular plan, improper delegation would not occur. And while the Commissioner may, if he believes it appropriate, grant authority to transact business on a county basis, we see no reason why he could not grant authority for operation on a different geographical basis, *e. g.,* a metropolitan area, or even a city, if he finds such operation to be appropriate for the particular plan under consideration.

Finally, the invalidity of the challenged parts of sections 2 and 3 does not affect the validity of the balance of the law. In reaching this conclusion we are aided by the severability section in the statute. *N. J. S. A.* 17:48A–25. In any event,

because the statute grants the Commissioner broad regulatory powers, we believe that the Legislature would have enacted it in the absence of the objectionable provisions. Without them there remains a complete, intelligent statute capable of being executed consistently with the main purpose and general intent of the Legislature. *State Bd. of Health v. Schwarz Bros. Co.*, 86 *N. J. L.* 170, 172–173 (*E. & A.* 1914).

We hold that the quoted part of section 3 of the Medical Service Corporations Law, *N. J. S. A.* 17:48A–3, is unconstitutional for the reasons expressed above. We further hold that the invalid parts of sections 2 and 3 are severable and accordingly their invalidity does not affect the remaining sections of the statute.

The matter is remanded to the Commissioner and he is directed to entertain appellant's application for a certificate of authority to transact business in accordance with the views expressed herein.

WEINTRAUB, C. J. (dissenting). The background of the statute in question may be summarized briefly. Apparently in response to agitation for socialized medicine, the Medical Society of New Jersey moved to provide medical services for a set annual charge. It formed a nonprofit corporation to that end. The Commissioner of Banking and Insurance claimed the plan was a form of insurance and could not be offered without enabling legislation. The Medical Society yielded to his view. There followed a cooperative effort to draft legislation.

As was pointed out in our earlier opinion in this litigation, *Group Health Ins. of N. J. v. Howell*, 40 *N. J.* 436, 451 (1963), the essential difference between the plan authorized by the statute and the usual contract of insurance is that whereas the usual insurance contract provides for the payment of fixed dollar indemnities, the plan before us contemplates that the medical service will be furnished under agreements between the medical plan and participating physicians requir-

ing the physician to accept scheduled payments from the medical plan in full payment for his services.[1]  The very essence of the plan is physician-participation.  The plan's solvency depends upon it, for in lieu of the substantial capital investment required of stock companies engaged in insuring on an indemnity basis (up to $250,000 for each kind of insurance, *N. J. S. A.* 17:17-6), the statute before us requires only the sum of $5,000 in cash to be on hand.  *N. J. S. A.* 17:48A-4.  To the extent that subscribers' physicians do not participate in the plan, the plan would be only an indemnity program and as such would not only be unsecured by a substantial capital investment but would also disappoint the subscribers who (despite the small print) would expect their medical bills to be met in full.

At some point in the prelegislative discussions, a member of the staff of the Commissioner of Banking and Insurance recommended that there be a requirement for a sufficient number of participating physicians to assure, in the words of the affiant, Dr. Lance, "both the practical application of full service benefits under certificates issued by a medical service corporation and the right of patients to have a free choice of physicians."  Without such a requirement, a plan could be offered by or with a handful of doctors, and a subscriber would then have to abandon his regular physician if he wanted his medical bill to be paid in full.  Percentage requirements up to 75% of eligible physicians in a county were considered.  The percentage finally selected was 51 and the Legislature adopted that recommendation in section 3 of the statute.  *N. J. S. A.* 17:48A-3.

Thus the Legislature enabled the medical profession to meet a public need by offering a medical service program, subject

---

[1] The statute authorizes the plan to permit a physician to make additional charges to a patient whose earnings exceed a stipulated figure.  To the extent that this occurs the payments are of an indemnity character, but this income limitation does not affect the constitutional issues before us.

however to regulation and control by the Commissioner of Banking and Insurance. The rates to be charged the subscriber may be disapproved by the Commissioner as "excessive, inadequate or discriminatory." *N. J. S. A.* 17:48A–10. A plan may be offered only by a "corporation organized without capital stock, and not for profit," *N. J. S. A.* 17:48A–1, so that no third party may profit from a plan.

As I have said, this statute was intended to enable the medical profession to meet a public need. That is precisely the history of the statute. It is also its operative effect notwithstanding that under its terms any group of men may organize a corporation, for if the statute is not misused by entrepreneurs with a profit motive, the sole parties in pecuniary interest are the physicians and the subscribers, and in the nature of the subject a plan cannot succeed without the participation of physicians. Inevitably physicians will have a substantial voice in a program that depends upon their willingness to accept set charges.

The provision in section 2 (*N. J. S. A.* 17:48A–2) that no person shall be elected a trustee of any medical service corporation unless his nomination has been approved by a recognized medical society was held invalid in our prior opinion only because the Constitution forbids the delegation of such power to a private organization. But the Legislature could have authorized the organized medical profession or organized segments of it to sponsor such plans, and surely, whether the service program is thus sponsored by the medical profession or by others, the Legislature may require the participation of such percentage of the profession as the Legislature reasonably believes to be necessary to serve the policy objectives it finds to be in public interest. Whether that policy decision is wise or foolish is no concern of the judiciary. We can inquire only into the constitutional power of the Legislature to do what it did.

## I.

The focal point of attack is the 51% requirement. The majority opinion finds it invalid for sundry reasons, none of which is imposing.

One difficulty is said to be that a considerable number of physicians are not in private practice because of retirement or governmental or corporate employment, and hence a medical service corporation could load its roster with unavailable doctors. This problem, unreal though it is, is readily met by recourse to the legislative purpose. Quite obviously "eligible physicians" are those who expect compensation from patients.

It is said there is no necessary relationship between the percentage requirement and the number of doctors engaged in a particular medical service which a policy may provide. The assumption is that a policy could or would be issued to cover only some narrow area of medical activity in which only a few doctors can and do engage. In that situation, the argument goes, it would be unreasonable to require the agreement of 51% of all physicians. The answer is quite simple: if such narrow coverage should be permitted, the "eligible" physicians would be those who work in that field.

The majority add that this distortion has been aggravated by recent legislation dealing with certain dental services, services furnished by registered bio-analytical laboratories, and services of chiropodists. There are at least two answers. If these additional statutes induce some constitutional infirmity, they will fall without dragging the principal statute with them. But the problem is merely one of construction as to whether the Legislature intended to amend the concept of "eligible physicians." If it should be held that an amendment was intended, the required minimum of eligible physicians would be determined in the light of that construction. Such issues of interpretation are routine and free of constitutional involvement.

Next we have a group of supposed difficulties clustering about the use of the county in determining the number of physicians who must participate. It is said the ratio of physicians to inhabitants varies from county to county; that although county lines are "perhaps a prima facie reasonable division of the State for the purposes of the statute," yet they do not clearly define areas for eligible services because to some extent both physicians and patients cross county lines; and that if doctors move into a county, a corporation with a marginal number of participating physicians may suddenly find its percentage has dipped below 51. The answer is that we must be practical in a practical world. If lines are desirable, they must be drawn somewhere. The county is an existing economic unit. Of course each county is not perfectly isolated from abutting counties but neither is any other area that could be selected or fashioned. The use of the county is a concession permitting a corporation to limit itself to an area less than the entire State. If the corporation chooses not thus to limit its solicitation of subscriptions, it need but comply in the additional counties into which it would venture.

Next the majority say there is no known source of information as to the precise number of physicians in the State or county and hence no figure to which the percentage could be applied. If no other source were available (I will not assume there is none), I would find telephone directories to be quite adequate to satisfy the legislative will.

The majority then find an invalid delegation of legislative power in that physicians will decide the fate of a medical service corporation by their willingness or unwillingness to enter into participation agreements. This is a strange concept of delegation of power. The majority could pursue that thesis further and attack the statutory provision for the demise of a corporation if "the number of subscribers to its service has decreased to less than one hundred persons," *N. J. S. A.* 17:48A–20, for the same thinking should denounce this provision as an unconstitutional delegation of legislative power

to the subscribers. Of course no delegation is involved. When the Legislature decides that a corporation shall have a minimum number of incorporators, it does not delegate legislative power to the individuals who may or may not agree to incorporate. If the Legislature provides for a recall upon the petition of a stated number of voters, it does not delegate legislative power to the citizens because they may choose whether to sign the petition. And so here, in calling for the agreement of 51% of the eligible physicians, the Legislature simply specified an ingredient of a plan which will qualify it to operate on a service basis and without capital investment.

These constitutional difficulties are utterly unreal, and this becomes evident in the portion of the majority opinion itself which authorizes the Commissioner of Banking and Insurance to proceed under the remnants of the statute:

"* * * Before issuing a certificate of authority, the Commissioner will no doubt determine whether the extent of participation of physicians is adequate in view of the proposed methods of operation of the applicant corporation. Of course, by requiring participating physicians, he would not be delegating licensing power to private persons. If his requirement did not exceed the number of doctors necessary to make a particular plan feasible and workable in the public interest, licensing power would not be delegated to doctors as a group or individually. In such circumstances doctors are similar to necessary capital, without which the plan is not feasible in the public interest. Improper delegation occurs only when doctors whose participation in the plan is not reasonably required are given the power to determine whether a plan otherwise feasible and operable should be allowed to transact business. So long as the number of required participating physicians is determined by considering the reasonable needs of the subscribers and the public with respect to the particular plan, improper delegation would not occur. And while the Commissioner may, if he believes it appropriate, grant authority to transact business on a county basis, we see no reason why he could not grant authority for operation on a different geographical basis, *e. g.*, a metropolitan area, or even a city, if he finds such operation *to* be appropriate for the particular plan under consideration."

Thus the majority authorize the Commissioner to fix the number of participating physicians, and this they say is proper if the number required does not exceed the number of

doctors necessary to make a particular plan feasible and workable. I do not see a connection between the number of physicians specified and the concept of delegation of legislative power. If delegation of power is involved, it is equally involved whether the number of delegees is one or 5,000. The analytical truth is that the 51% requirement does not involve this constitutional problem at all, and that the only conceivable constitutional question is whether that percentage is so plainly unnecessary to achieve a legitimate legislative aim that it must be denounced as arbitrary. It cannot be so denounced since it bears logically upon the proper legislative purpose to assure a fair opportunity for a free choice of a physician, to say nothing of the assurance it gives to the financial integrity of a corporation without capital investment.

And the concluding sentence of the excerpt from the majority opinion, in authorizing the use of any geographical area, invites most of the very difficulties which but a few pages before had led the majority to condemn the Legislature's selection of the county.

## II.

If the statute had the myriad defects the majority find, it would fall in its entirety. There would be nothing to sever and save. An invalid provision is severable only when the legislative policy can be achieved without it. Here the Legislature required participation by 51% of the eligible physicians. That requirement goes to the guts of the plan. As we have said, it rests upon a legislative policy that there be a free choice of physicians and that there be physician-participation to a degree that assures a fair prospect that the doctor the subscriber prefers will accept the stipulated payments in full.

In our first opinion in this cause, we remanded the matter to the Commissioner for testimony as to what measures he

could employ to protect the public interest if the 51% provision were excised. The record returned to us is wholly uninformative, and the reason is that until the policy objective is specified, no one can talk sensibly in terms of implementation.

What policy will the Commissioner seek to achieve? The majority opinion refers only to so much of *N. J. S. A.* 17:48A–3 as speaks of "operations hazardous to the public or its subscribers." Those words seem to refer only to fiscal integrity, including the fulfillment of the subscriber's expectation of payment in full rather than a mere indemnity. Even to that limited end the Commissioner will necessarily require that the number of participating doctors be related to the number of subscribers and the area of solicitation, and no doubt in doing so the Commissioner will be forced to use standards of a kind the majority find invalid when fixed by the Legislature itself.

But the more important question is whether the Commissioner may seek to assure a free choice of physician, an end to which the Legislature attached great importance by the very provision the majority excised. Suppose a plan contemplates that only ten designated physicians will furnish the specified medical services. Obviously that kind of interference with the usual physician-patient relationship has important social implications. Could the Commissioner disapprove the plan on that account? I do not see how he could under what remains of this statute. But if the majority opinion would permit the Commissioner to formulate a policy in that area, then upon what constitutional theory can the power be denied the Legislature itself?

I mentioned at the outset that the statute was intended to permit the medical profession to offer a service policy to the public. The Medical Surgical Plan of New Jersey was created under it. Even the chairman of the board of the plaintiff corporation spoke highly of the operation of that plan. The witness merely proffered a proposal of his own. No doubt

new ideas will emerge from time to time, just as the Blue Shield concept emerged, and these new plans may well be beyond existing statutory authority just as the Medical Society found its plan was beyond such authority. When this occurs, the proposal should be advanced in legislative halls. That is where it belongs.

I think it is dangerous business for the judiciary to strike down a statute or essential parts of it merely because someone has still another plan of insurance which does not fit within any of the statutes in this area. The Court should not revise a statute to provide that anyone may form a nonprofit corporation and sell insurance policies without any capital whatever or any legislated substitute for it. It seems to me that the only justiciable issue is whether plaintiff's plan is so devoid of potential harm that it is a denial of due process for the Legislature to fail to authorize it. Plaintiff, of course, makes no such claim or showing. Indeed plaintiff's plan was never laid out in any detail at all with respect to either fiscal integrity or the protection of a free choice of physician. In any event I suppose it would be odd for a bare-bones nonprofit corporation to maintain that it is a denial of due process to prevent it from embarking upon a nonprofit venture.

For these reasons I would affirm the action of the Commissioner.

Haneman, J., joins in this dissenting opinion.

*For remandment* — Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—5.

*For affirmance* — Chief Justice WEINTRAUB, and Justice HANEMAN—2.