**The PRUDENTIAL PROPERTY AND CASUALTY COMPANY, Plaintiff,**

v.

**INSURANCE COMMISSION OF the SOUTH CAROLINA DEPARTMENT OF INSURANCE; John W. Lindsay, Chief Insurance Commissioner; South Carolina Reinsurance Facility, Defendants.**

**Civ. A. No. 79–255–14.**

United States District Court,
D. South Carolina,
Columbia Division.

March 16, 1982.

George E. Lafaye, III, Columbia, S.C., W. Francis Marion and Joseph J. Blake, Greenville, S.C., for plaintiff.

C. H. Jones and Victor S. Evans, L. Kennedy Boggs, E. W. Laney, III, and Thomas C. Salane, Columbia, S.C., for defendants.

WILKINS, District Judge.

This is an action tried without a jury in which Plaintiff seeks monetary damages and declaratory relief based upon a broad challenge to the constitutionality of the Plan of Operation by which profits and losses of the South Carolina Reinsurance Facility are apportioned among the members of the Facility. Plaintiff argues that the Facility's Plan of Operation should be declared null and void because it violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment and contravenes Sections 38–37–730 and 38–37–950 of the South Carolina Code of Laws. Plaintiff also alleges that the South Carolina Automobile Reparation Reform Act of 1974, Act 1177, which created the Reinsu-

rance Facility, establishes an impermissible delegation of legislative authority and violates the Contracts Clause of the United States Constitution. This Court rejects each of these arguments.

Under Act 1177, automobile insurers are prohibited from refusing to write or renew automobile insurance policies for any insurable applicant. *S.C.Code Ann.* § 38–37–310 (1976). Under this section, automobile insurers are required to insure anyone seeking insurance, regardless of the level of risk indicated by an individual's past driving record or other factors. In order to minimize the hardship placed upon insurance companies by this requirement, Act 1177 created the South Carolina Reinsurance Facility. *S.C.Code Ann.* § 38–37–110(4) (1976). All automobile insurers, doing business in South Carolina, are required to participate as members of the Facility and are bound by the Facility's duly promulgated rules and regulations. *See S.C.Code Ann.* §§ 38–37–710, *et seq.* (1976). The Facility is designed to provide a mechanism for fairly distributing the cost of insuring "bad risks" throughout the insurance industry. This is accomplished by allowing an insurer to cede to the Facility a certain portion of its policies. Of course, only "unacceptable risks" are ceded to the Facility. An "unacceptable risk" is defined generally by the insurance industry as one whom statistics indicate will prove to be unprofitable.

The Facility, by statute, is subject to the rules and regulations promulgated by the Insurance Commission which are consistent with the purposes of Act 1177. *S.C.Code Ann.* § 38–37–710 (1976). Also, Act 1177 provides that the Governing Board of the Facility shall adopt a plan for its operation subject to the approval of the Insurance Commission. *S.C.Code Ann.* § 38–37–730 (1976). This Plan of Operation is designed to deal with the daily functions of the Facility, including how the losses or profits from its operation are to be shared among its members.

The Facility's Plan of Operation, as originally promulgated, provided for the distribution of the net losses or gains of the Facility based upon an individual insurer's share of the market (known as a "market penetration" approach). Under this approach, an insurer writing ten percent of the total market in premium dollars would assume ten percent of the net operating profit or loss of the Facility. This distribution applied regardless of the number of risks the insurer actually ceded to the Facility. For example, an insurer writing ten percent of the total market would assume ten percent of the loss of the Facility, even if that insurer ceded no policies.

On September 27, 1979, the Plan of Operation was amended to provide for a profit or loss distribution based primarily upon the individual insurer's utilization of the Facility. Under this approach, individual insurers share in the losses of the Facility to the degree that they utilize the Facility in comparison to the total utilization of the Facility by all its members. For example, an insurer which cedes fifty percent of the policy amounts received by the Facility for any one particular year, would be charged with half of the Facility's losses which occur during that year. An insurer who cedes no policies to the Facility would owe nothing. However, the market penetration approach was not completely abandoned under the amended Plan of Operation. The amended plan provides for loss distribution based upon a weighted average of an insurer's penetration of the market and its utilization of the Facility, giving an eighty percent weight to the Facility utilization portion and a twenty percent weight to the market penetration portion.

I. DOES THE AMENDED PLAN OF OPERATION VIOLATE THE DUE PROCESS OR EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT?

It is Plaintiff's contention that use of the Facility utilization or market penetration approaches, either separately or combined as in the present amended plan, constitutes a violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Plaintiff argues both approaches are

unconstitutional because they necessarily result in an inequitable sharing of the costs of insuring "bad risks" in the state. Plaintiff explained the alleged disparate treatment caused by the amended Plan of Operation to the Court in this hypothetical illustration:

[L]et us assume that these two companies, A and B, with each writing 100 policies. Company B, having no residual risk, cedes no business to the Facility, however company A finds 25 risks which are residual and it, in turn, cedes them to the Facility. As a result of writing the same number of policies, each company is assigned the same share of the net loss of the Facility. Whereas this may appear to be a fair sharing of the residual market losses, it is not. Neither company A nor company B can simply absorb these Facility losses and must make up such losses by adjusting their rates (this being contemplated by the Reinsurance Plan). If both companies charge the same additional premium, company A will only retain 75% of the amount received by company B. This is because the additional premium on the 25 ceded insureds that company A had on its books will go directly to the Facility when these insured are ceded.

If, in the alternative, company A elects instead to increase its premium to recoup the same amount as company B, it must increase its premium more than company B. Company A's policyholders then will be faced with the alternative of either paying a higher premium for the same policy that company B writes or switching over the [sic] company B, leaving company A with even fewer policyholders. The situation is obvious: the policyholders given such circumstances will, in the great majority of cases, take the lower premium for the same coverage. Consequently, company A is no longer competitive and has been penalized for writing a disproportionately large share of the residual risks.

Under the utilization concept, the violation of the equal protection clause is even more self-evident, as all of the losses of the residual market would have to be paid entirely by company A since it alone used the Facility. Since company B does not share in the Facility losses, it does not have to charge its risks anything and, conversely, company A would be forced to absorb the entire loss or pass the entire amount on to its insured—even greater inequities than identified under the market penetration method would result. Adopting a formula which mixes the two methods, as in the Facility's current allocation procedure, does not remove these inequities.

■ Accepting, arguendo, Plaintiff's hypothetical as a correct representation of the facts present in the case before the Court, no violation of the Equal Protection or Due Process Clauses occurs. In order to establish a case for unconstitutional discrimination under the Equal Protection Clause, it is first necessary to prove that the contested Plan of Operation divided similarly situated groups into separate classes, the members of certain classes receiving disparate treatment under the law. *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), *Shortino v. Wheeler*, 531 F.2d 938 (8th Cir. 1976). In the hypothetical, Plaintiff contends that the Plan of Operation creates separate classes between those companies which have a high percentage of the residual risk (bad risk) market, and those which have none of the bad risk market. Those which have a high percentage of the bad risk market receive disparate treatment under the law because they are forced to bear a higher percentage of the costs of insuring bad drivers than are similarly situated insurance companies which have very little of the residual risk market.

■ Once disparate treatment among similarly situated parties is proven, the issue of constitutionality is determined based upon the type of judicial scrutiny warranted. *Parham v. Hughes*, 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979). Legislation causing disparate treatment based on a "suspect classification" such as race or religion, or a classification which affects a

"fundamental freedom," receives very strict scrutiny by the courts. However, legislation intended merely as economic regulation receives only "reasonable scrutiny." *Hughes v. Alexandria Scrap Corporation*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), *United States v. Weatherford*, 471 F.2d 47 (7th Cir. 1972). Legislation subject only to reasonable scrutiny, even though it may cause some disparate treatment among similarly situated businesses, will not be held violative of the Equal Protection or Due Process Clauses of the Fourteenth Amendment if it bears a "rational relationship to a permissible state objective." *McCullough v. Redevelopment Authority of the City of Wilkes-Barre*, 522 F.2d 858 (3rd Cir. 1975). Such legislation need not be the best resolution of a particular problem. It can, in fact, be seriously flawed and result in substantial inequality and still remain constitutional if it has some reasonable basis. *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). It will not be set aside if "any state of facts reasonably may be conceived to justify it." *Id.* at 485, 90 S.Ct. at 1161.

▆▆▆ There can be no dispute that the regulation complained of in this case is purely economic, involving no suspect classification or fundamental freedom. Therefore, it need only bear a rational relationship to a permissible state objective and will not be set aside if any facts may be conceived to justify it. Clearly, there is a permissible state objective inherent in this legislation.[1] It is designed to make certain that automobile insurance will be available to all drivers and that, conversely, all drivers will be insured. Also, it is evident that the establishment of the Facility, and the promulgation of the contested Plan of Operation, bears a rational relationship to that goal.

In addition to the fact that the hypothetical presented does not state a violation of the Equal Protection or Due Process Clauses, it also does not accurately represent the reality of the marketplace. Plaintiff's hypothetical involves two companies charging the same rate, each doing equal business. One company has twenty-five percent residual risks and the other company has no residual risks. However, it is only reasonable to assume, as the drafters of the amended Plan of Operation obviously did, that companies charging the same rates, attracting identical amounts of business, are apt to attract very similar amounts of residual business. There is no logical basis for the assumption that, all other factors being equal, one company should expect to consistently attract significantly higher levels of residual business than other companies.[2]

1. *See California State Auto Ass'n. Inter-Ins. Bureau v. Maloney*, 341 U.S. 105, 109, 111, 71 S.Ct. 601, 603, 604, 95 L.Ed. 788 (1951). This case involved a California law requiring all insurers transacting liability insurance in the state to participate in a plan apportioning throughout the insurance industry applicants unable to procure automobile insurance through ordinary methods. Plaintiff, an unincorporated association engaged in providing insurance solely for members of a private automobile club, challenged the law because it required Plaintiff to insure non-members of the club who were poor risks. In holding that the law did not violate the Fourteenth Amendment, the United States Supreme Court stated:

> What was there said about the police power—that it "extends to all the great public needs" and may be utilized in aid of what the legislative judgment deems necessary to the public welfare . . . is peculiarly apt when the business of insurance is involved—a business to which the government has long had a "special relation."

> [B]usiness may of course be less prosperous as a result of the regulation. That diminution in value, however, has never mounted to the dignity of a taking in the constitutional sense.

2. Plaintiff seemed to argue that it received a higher level of the residual market than was normal in the industry because of its relatively new entry into the market in South Carolina. No evidence was presented which even suggested that the amended Plan of Operation may have been promulgated with the intention of penalizing new businesses or preventing them from entering the market. It may be true that established businesses do often enjoy a "preferred status" over new businesses due to innumerable factors, including such things as prolonged advertising and the promotion of good will with established customers. However, to the extent that poorer risks may gravitate to newer businesses, if indeed such a phenomenon does occur, it is obviously the result of market conditions and human nature, not the amended Plan of Operation.

This is not to suggest that companies charging identical rates and selling identical numbers of policies should always expect to have exactly equal amounts of the residual market. Some fluctuations can be expected due to the laws of random chance. However, these variations are anticipated by the statutory scheme and reasonably protected against. To buffer the effect of variations which can be reasonably anticipated, the State Legislature provided for a uniform merit rating plan and the recoupment of Facility losses in the rate-making process. *See S.C.Code Ann.* §§ 38–37–540 and 38–37–780 (1976). Under the merit rating plan authorized by the Commission, insurers are permitted to surcharge objectively poorer risks as judged by their driving records. The higher premiums produced by these surcharges are designed to make the marginal, although non-residual, risk more profitable to retain by the insurer rather than to cede to the Facility. Also, use of a recoupment formula in the rate-making process allows insurers to recapture past losses incurred from Facility operations in their current rate level.

The only companies which should logically expect to consistently attract a larger percentage of the residual market, are those companies which charge the lower rates.[3] By charging lower rates, it is reasonable to assume that, all other factors being equal, those companies will attract more business. In this greater percentage of overall business, they can also expect a greater portion of the residual business. This amounts to nothing more than the cost of being permitted to operate in the state. These companies are allowed to enjoy the benefits of doing large amounts of "good" business. In conjunction with these greater benefits, it is not inequitable to expect them to bear the cost of a greater percentage of the "bad" business.

## II. IS THE AMENDED PLAN OF OPERATION NULL AND VOID BECAUSE IT IS INCONSISTENT WITH THE GOVERNING STATUTE, ACT 1177?

Any regulation or plan of operation, promulgated by the Governing Board of the Reinsurance Facility and approved by the State Insurance Commission, which is inconsistent with statutory law would, of course, be null and void. *See S.C.Code Ann.* § 38–37–710 (1976). Plaintiff argues that the amended Plan of Operation is inconsist-

---

**3.** *See Prudential Property and Cas. Ins. Co. v. Insurance Com. of S. C.,* Order No. 80–CP–40–3914 (Common Pleas Court, May 28, 1981). Plaintiff brought this action before the South Carolina Insurance Commission seeking leave to cede sixty percent of its business to the Reinsurance Facility. The Insurance Commission denied Plaintiff's request and Plaintiff appealed that decision to the Court of Common Pleas in Richland County. That Court, in affirming the decision of the Insurance Commission, concluded that Plaintiff's difficulties with the poor risk market stemmed primarily from the fact that Plaintiff had set its rates too low. The Court stated:

The record fully supports the Commissioner's conclusions that Prudential's rate structure was characteristically lower than that of the industry as a whole during the period in question. In fact, Prudential's overall rate level was approximately 10 percent below that of the industry standard. Not only was Prudential's rate lower, but that rate was intentionally selected by Prudential for its market entry so as to be more competitive with other insurers operating within the State and to be attractive to potential insureds. This is so despite the undisputed

fact that Prudential fully expected higher expense and start-up costs as a consequence of its recent entry into the State's market. Its actual expenses were characteristically 10 percent higher than the budgetary allowance reflected by its rate structure. Thus, even though Prudential's rate revision subsequent to 1973 tracked those of the industry, its entry level rate was less than realistic considering these other factors. During the same time, Prudential experienced uncontrolled, although not uncontrollable, growth. From 1973 through 1978 Prudential maintained its rates at a level lower than other established insurers but without the "seasoned book" of business which other insurers enjoyed. Consequently, the record fully supports the Commissioner's finding that Prudential's rates were generally inadequate to support its market entry without also sustaining higher than average losses. Further, the record supports the finding that Prudential's objective was to maintain an attractive, price competitive rate, despite higher start-up costs and expenses and without acquiring a balanced book of business through controlled growth.

ent with statutory law because it bases the distribution of the Facility's losses primarily upon a Facility utilization formula, rather than solely upon a market penetration approach which, Plaintiff maintains, Act 1177 requires. Plaintiff's argument that Act 1177 mandates distribution based solely upon a market penetration formula, is based upon the following statutory language:

> Any such apportionments shall give consideration to a comparison between the writings or car-year exposures of each insurer of automobile insurance and the total writings or car-year exposures of all such insurers.... [See S.C.Code Ann. § 38–37–730 (1976).]

> A prima facie case of excessive or unreasonable utilization shall be established upon a showing that an automobile insurance insurer or a group of such insurers under the same management has ceded or is about to cede more than thirty-five percent.... [See S.C.Code Ann. § 38–37–950 (1976).]

Plaintiff argues that Section 38–37–730 obviously contemplates the use of a market penetration formula because, by its plain wording, it requires that consideration be given to the amount of insurance any individual insurer has written compared to the total insurance written by all insurers in the state. Market penetration formulas are based precisely upon that comparison. Also, under the market penetration approach, Section 38–37–950 seeks to generally prevent insurers from ceding more than thirty-five percent of their business to the Facility. This limitation makes sense under a market penetration approach because losses are apportioned based on the amount of insurance issued, regardless of the number of policies actually ceded to the Facility. For example, a company insuring ten percent of the market in South Carolina would assume only ten percent of the Facility's losses, even if that company ceded ninety percent of its business to the Facility. Therefore, some sort of limit on the number of policies which could be ceded to the Facility is desirable when losses are distributed on this basis. However, under an approach distributing losses based primarily upon market utilization, the approach now used, such a limitation serves no purpose.

Under the market utilization approach (as compared to market penetration), losses are distributed based upon the amount of business each insurer cedes to the Facility. The more business an insurer cedes, the greater percentage of the losses of the Facility that insurer assumes. Therefore, limitation on the amount of business which may be ceded is both unnecessary and unwarranted. Consequently, Plaintiff argues, the State Legislature obviously did not contemplate the use of a Facility utilization formula because if such an approach had been contemplated, no limitation would have been included in the law. In essence, Plaintiff argues, by promulgating the present amended Plan of Operation, the Governing Board rendered Section 38–37–950 void. All insurers are now free to cede any amount of business to the Facility as long as they are willing to assume a higher percentage of the Facility's losses.

Were the provisions cited by Plaintiff the only relevant ones, Plaintiff would have a compelling argument. However, the following provisions of Act 1177 reveal that a market utilization formula was indeed contemplated by the State Legislature:

> [O]r the Commission may approve or require any other similar or comparable provision for the apportionment of the expenses or gains or losses of the Facility which relates insurers' shares to their respective *utilization of the Facility*. [Emphasis added.] [See S.C.Code Ann. § 38–37–730(2).]

> To provide a reinsurance facility for automobile insurance insurers in which all such insurers shall participate to the end that the operating expenses and net profit or loss of such Facility may be shared equitably by all such insurers transacting an automobile insurance business in this State *giving appropriate consideration to degrees of utilization of such Facility by the several insurers* [emphasis added] of automobile insurance and to provide pro-

hibitions or penalties in respect to excessive utilization of the Facility. [*See S.C. Code Ann.* § 38–37–110(4) (1976).]

Both code sections explicitly approve the adoption of a plan of operation by which loss distribution may involve a Facility utilization approach.

Plaintiff is incorrect that Section 38–37–730 mandates the use of a market penetration formula. This statute states only that the apportionment plan "shall give consideration to a comparison between the writings or car-year exposures of each insurer of automobile insurance and the total writings or car-year exposures of all such insurers." It does not state that *sole* consideration shall be given to such a formula, only that consideration should be given. Of course, under the present amended Plan of Operation, consideration is given to the market penetration approach in conjunction with a Facility utilization formula. The amended Plan provides for loss distribution based upon a weighted average of an insurer's penetration of the market and its utilization of the Facility, giving an eighty percent weight to the Facility utilization portion and a twenty percent weight to the market penetration portion.

Also, the amended Plan of Operation does not contravene Section 38–37–950. While the new rule would allow an insurer to cede more than thirty-five percent of its business to the Facility, such cessions would also entail a higher assessment of Facility losses based upon that increased utilization. Section 38–37–950 declares that no insurer should be permitted to excessively or unreasonably utilize the Facility to create an unfair competitive advantage over other insurers, or to unfairly discriminate against certain classes or types of risks. The prohibition is against the unreasonable or excessive utilization for unfairly competitive or discriminatory purposes and not merely to the cession of more than thirty-five percent of an insurer's business. The thirty-five percent guideline of Section 38–37–950 represents a non-conclusive, statutory presumption of excessive utilization to gain a

competitive advantage. *See Hartford Accident and Indemnity Co. v. Lindsay*, 273 S.C. 79, 86, 254 S.E.2d 301, 305 (1979). Under the old rule apportioning losses exclusively upon an insurer's market share, the legislative presumption of excessive utilization was difficult for an insurer to overcome. Apportionment based upon a weighted utilization approach, however, effectively rebuts any presumption of unfair competitive purposes since the ceding insurer's obligation for Facility losses also increases proportionately and eliminates any competitive advantage.

■ Before this Court may strike down the amended Plan of Operation as inconsistent with Sections 38–37–950 and 38–37–730, the Plaintiff must show "not merely that the challenged provisions are not the most reasonable of the alternatives permitted by the statute, but that they are 'plainly erroneous or inconsistent'." *Corum v. Beth Israel Medical Center*, 373 F.Supp. 550, 554 (S.D.N.Y.1974). *See also, Gulf Oil Corporation v. Hickel*, 435 F.2d 440, 444 (D.C.Cir. 1970). "[A] regulation issued . . . under the direct authority of the statute may not be found invalid for inconsistency unless the variance is so clear that it is manifest that the court has no choice except to hold that the administrator has exceeded his authority and employed means that are not appropriate to the end specified in the act." *Gardner v. United States*, 239 F.2d 234, 237 (5th Cir. 1956). Plaintiff has failed to show that the amended Plan of Operation is "plainly inconsistent" with Act 1177. It is clear, when Section 38–37–730 is read in its entirety and in conjunction with Section 38–37–110(4), that the State Legislature approved loss distribution based upon a number of possible formulas. Among these formulas, both market penetration and Facility utilization are explicitly approved. Therefore, their combined use in the amended Plan of Operation is not inconsistent with Act 1177. Also, it is clear that this plan is not plainly inconsistent with Section 38–37–950. There is a reasonable interpre-

tation of the statute which eliminates the asserted inconsistency.[4]

## III. DOES ACT 1177 PROVIDE FOR AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY?

Plaintiff asserts that Act 1177, by giving to the Facility's Governing Board the power to change the method of apportioning Facility losses, unconstitutionally vests its competitors with a purely governmental function. The Facility's governing body consists of 15 members: three consumer representatives appointed by the Governor; eight insurance industry representatives appointed by the Chief Insurance Commissioner; and four insurance agents/producers appointed by the Chief Insurance Commissioner. *See S.C.Code Ann.* § 38–37–790 (1976). Plaintiff maintains that a number of the insurance industry and agent/producer members appointed to the Governing Board represent insurance companies with which Plaintiff is in competition.

The Governing Board is charged with the responsibility of promulgating a plan for the operation of the Facility which equitably apportions losses and profits among the members. However, plans adopted by the Governing Board may not be put into effect until they are reviewed and approved by the Insurance Commission. *See S.C.Code Ann.* § 38–37–730 (1976). The present amended Plan of Operation did not originate in the Governing Board. It was proposed to the Governing Board by the Insurance Commission. The Governing Board adopted the amended plan and it was subsequently approved by the Insurance Commis-

sion. Notwithstanding these facts, Plaintiff argues that fundamental regulatory authority is vested in its competitors through the Governing Board.

 It is certain that the Due Process and Equal Protection Clauses of the Fourteenth Amendment prohibit the delegation of legislative functions to private persons or associations. *Carter v. Carter Coal Company,* 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), *United Citizens Party of South Carolina v. South Carolina State Election Commission,* 319 F.Supp. 784 (D.S. C.1970). However, Plaintiff's contention that an unconstitutional delegation of legislative authority is established by Act 1177 is not well founded. Under Act 1177, the Governing Board of the Facility is subordinate to the Commission. It is the Commission, not the Board, which determines whether amendments to the Plan of Operation "are consistent with the purposes" of the Act and are to be approved. *See S.C. Code Ann.* § 38–37–730 (1976). This is not a case in which regulatory power is vested solely in Plaintiff's competitors. *Compare Carter v. Carter Coal Company,* 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), *with Sunshine Anthracite Coal Company v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940). When, as here, it is the Commission that exercises pervasive oversight and authority over changes in the Plan of Operation, there is no unconstitutional delegation of regulatory authority to private interests. *Sunshine Anthracite Coal Company v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); *Currin v. Wallace,* 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939); *United States v. Rock Royal Co-operative,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446

---

4. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). In describing the deference which the courts should grant an interpretation given to a statute by those persons charged with the responsibility of putting that statute into effect, the United States Supreme Court stated:

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's appli-

cation of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. . . ." "Particularly is this respect due when the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."

(1939); *R. H. Johnson & Co. v. Securities & Exchange Commission*, 198 F.2d 690 (2d Cir. 1952); *Simon v. Cameron*, 337 F.Supp. 1380 (C.D.Cal.1970).

## IV. DOES THE MANDATORY INSURING PROVISION UNDER ACT 1177 VIOLATE THE CONTRACTS CLAUSE OF THE CONSTITUTION?

Plaintiff argues that the provision under Act 1177 prohibiting insurers from refusing to write or renew automobile insurance policies for any insurable applicant violates the Contracts Clause of the United States Constitution. *See S.C.Code Ann.* § 38–37–310 (1976). This contention is without merit. The Contracts Clause prohibits only significant legislative alterations of existing obligations, not the prospective requirement that automobile insurers accept eligible risks. *See California State Automobile Association Inter-Insurance Bureau v. Maloney*, 341 U.S. 105, 71 S.Ct. 601, 95 L.Ed. 788 (1951); *Veix v. Sixth Ward Building & Loan Association of Newark*, 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940). A state may permissibly condition the privilege of doing business on the requirement that private industry service local needs as they are defined by the Legislature. *Osborn v. Ozlin*, 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074 (1940). Where, as here, legitimate public interests are served by the Legislature's enactments, any non-vested, anticipatory contractual relationships must yield.

The Court has considered all other arguments urged by Plaintiff and has found them equally unconvincing. The Court finds that Act 1177 and the present amended Plan of Operation of the Reinsurance Facility is a valid exercise of legislative and regulatory authority within the Constitution. The Court is not granted the authority to substitute a new Plan of Operation, which the Court has determined to be preferable to the existing one, as long as the existing plan meets minimum constitutional and statutory requirements. Judgment is entered in favor of the Defendants.

AND IT IS SO ORDERED.