**EVANSTON INSURANCE COMPANY, INC., Appalachian Insurance Co., Risk & Insurance Management Society, and Donald A. Brody, Plaintiffs,**

v.

**Kenneth D. MERIN, New Jersey Property-Liability Insurance Guaranty Association, and Thomas H. Kean, Defendants.**

Civ. A. No. 84–3743.

United States District Court,
D. New Jersey.

Nov. 19, 1984.

Holzapfel, Perkins & Killy, William R. Holzapfel, Cranford, N.J., LeBoeuf, Lamb, Leiby & MacRae, Cecilia Kempler, New York City, for plaintiffs.

Irwin I. Kimmelman, Atty. Gen. of N.J., John J. Hayden, Deputy Atty. Gen., Trenton, N.J., for defendants Thomas H. Kean and Kenneth D. Merin.

Stryker, Tams & Dill, Richard R. Spencer, Jr., and William Heller, Newark, N.J., for defendant New Jersey Property-Liability Insurance Guaranty Association.

Kroll, Pomerantz & Cameron, Sol Kroll, New York City, Haskins, Hack, Piro & O'Day, John C. Lane, West Orange, N.J., for amicus curiae The Institute of London Underwriters.

## OPINION

SAROKIN, District Judge.

### INTRODUCTION

The plaintiffs in this matter challenge the right of the State of New Jersey to impose fees upon them for issuing coverage insuring persons or property within the state. Primarily plaintiffs contest the constitutionality of the statute here in question on the ground that surplus lines insurance companies do not, indeed are not permitted to, do business in this state. All business of this nature must be conducted through authorized surplus lines brokers, and plaintiffs contend that they have no presence in this state which properly subjects them to the fees being exacted by the state.

It is undisputed that the subject legislation was enacted as the result of the insolvency of a surplus lines carrier. In order to protect against such a reoccurrence the challenged legislation was enacted so as to provide a ready reserve fund to meet such a contingency.

The state has a substantial interest in protecting its citizens who have obtained

insurance on risks within its borders from defaults by insurers outside of its borders. A common fund is an accepted and established means of affording such protection.

All of the characteristics relied upon by plaintiffs to refute the reach of the State of New Jersey over their activities is overcome by the simple fact that they are engaged in insuring persons and property within the state through in-state agents, seek and obtain eligibility to issue such coverage, and are compensated for such insurance by persons and companies within the state. Notwithstanding the limitations and restrictions imposed upon their activities, the state in the interest of its citizens may impose reasonable conditions upon such companies in order to protect those who utilize their services. They derive an obvious benefit from the placement of such insurance. They may avoid their contribution by foregoing that benefit. On the other hand, they cannot accept the benefit without satisfying the reasonable and justifiable conditions imposed upon them.

For the reasons hereinafter set forth, the court finds the statute to be constitutional.

### FACTS

On February 14, 1984, Ambassador Insurance Company, a "surplus lines" insurer incorporated in Vermont, was declared insolvent by an Arizona state court. Aff. of Cecilia Kempler, ¶ 31. On March 30, 1984, the Commissioner of Banking and Insurance in Vermont applied to a Vermont Superior Court for an order declaring Ambassador insolvent and directing the Commissioner to liquidate the business. Defendant's Brief at 9. Over three thousand claims involving policyholders and claimants in the State of New Jersey remained outstanding, with a total value of 10 to 12 million dollars—far exceeding the company's assets. Statement accompanying New Jersey Surplus Lines Insurance Guaranty Fund Act, Exhibit C to Kempler Aff. Affected policyholders "[ran] the gamut from individual homeowners, to small retail establishments to several hundred governmental entities, including municipal police departments, housing authorities, and improvement authorities." *Id.*

To meet this crisis, the State of New Jersey enacted the New Jersey Surplus Lines Insurance Guaranty Act, 1984 N.J. Laws, ch. 101, on July 27, 1984. The Act was designed to "provide a mechanism for the payment of covered claims under certain insurance policies issued by eligible surplus lines insurers; to avoid excessive delays in the payment of the covered claims against insolvent eligible nonadmitted insurers; and to avoid financial loss to claimants or policyholders because of the insolvency of an eligible nonadmitted insurer." Section 2. The Act created the New Jersey Surplus Lines Insurance Guaranty Fund to pay the covered claims of "surplus lines" policyholders whose insurers became insolvent and to recover amounts paid to the extent possible from the estates of insolvent insurers. The Act also requires contributions to the Fund from other currently "eligible", "surplus lines" insurers, which are deemed members of the Fund.

Plaintiffs in this action, two "surplus lines" insurers and two asserted representatives of New Jersey insureds, challenge the constitutionality of the Act. Because the court finds the Act a reasonable exercise of the state's legitimate legislative power, the court deems the Act constitutional in all respects.

### 1. *Background*

New Jersey, in common with all other states, has developed a comprehensive regulatory scheme governing the issuance of insurance and the operation of insurance companies in the state. New Jersey's insurance law differentiates between two broad categories of insurers: "admitted" or "authorized" insurers, on one hand, and "surplus lines" insurers on the other. "Authorized" and "admitted" insurers are domestic and foreign insurers, respectively, which have qualified to transact insurance business directly with prospective insureds in the State of New Jersey. See N.J.Stat. Ann. 17:17–1, *et seq.*, 17:32–1, *et seq.* These extensively regulated insurers pro-

vide coverage for the bulk of insurance risks in the state. Indeed, New Jersey forbids the representatives of any insurer other than an admitted or authorized insurer to transact insurance business in the state. N.J.Stat.Ann. 17:22–6.37.

One exception to this prohibition permits the placing of "surplus lines" coverages with designated "surplus lines" insurers. "Surplus lines" insurers are by definition foreign insurers, not authorized to do business in the state directly, which nevertheless have been declared eligible to receive New Jersey insurance business through specially licensed "surplus lines" agents. It is these insurers which are the regulatory subject of the challenged Act.

According to New Jersey's surplus lines law, a New Jersey insurance risk may be "exported" to one of these surplus lines insurers only upon a showing that the coverage requested is not procurable from an admitted or authorized insurer after "diligent effort." N.J.Stat.Ann. 17:22–6.43. The risks are then "exported" by surplus lines agents, who are specially licensed by the state to handle surplus lines coverages. N.J.Stat.Ann. 17:22–6.42, 6.55. These surplus lines agents are not employees of the surplus lines insurers. N.J.Stat.Ann. 17:22–6.41. Yet, they are the exclusive conduit through which surplus lines insurers may seek eligibility to receive "exported" coverages as an initial matter. N.J. Stat.Ann. 17:22–6.45(a) ("[e]ligibility of the insurer must be requested in writing by a licensed surplus lines agent"). An insurer's eligibility to receive these coverages is determined based on the prospective surplus lines insurer's apparent financial condition and trustworthiness, as well as on the sponsorship of a surplus lines agent. N.J.Stat.Ann. 17:22–6.45.

Once an insurer is declared "eligible," the insurer is entered onto a periodically published list of eligible surplus lines insurers, known as the "white list," from which surplus lines agents may draw to place coverages. See N.J.Stat.Ann. 17:22–6.45. In the placement process, surplus lines agents negotiate all coverages on behalf of the insurer with prospective insureds or their brokers. Where the surplus lines agent has been granted binding authority by an insurer, see N.J.Stat.Ann. 17:22–6.42, the agent may bind coverage immediately upon payment of the premium; otherwise, the agent seeks approval of the coverage from the insurer, and transmits that approval to the insured. The agent is charged with supplying evidence of coverage to the insured, see N.J.Stat.Ann. 17:22–6.50, and with filing a copy of the policy issued with the Commissioner. N.J.Stat. Ann. 17:22–6.51. The insurer is deemed to have received a premium once it has been received by the agent. N.J.Stat.Ann. 17:22–6.54. Taxes on the coverages are either collected by the agent or paid directly by the insured. N.J.Stat.Ann. 17:22–6.-59, 6.64.

New Jersey does not purport to prohibit surplus lines insurers from dealing directly with New Jersey residents who leave the state to seek these insurers out. Within its own borders, however, the state restricts surplus lines insurers from receiving any insurance business without the aid and sponsorship of surplus lines agents and prohibits any direct contact with prospective New Jersey insureds. Despite this restriction, eligible insurers receive millions of dollars of net direct written premiums each year.

This special restriction on the manner in which surplus lines insurers may receive business in New Jersey corresponds to their relatively greater freedom from state regulation, as compared to admitted and authorized insurers. For example, surplus lines insurers need only establish the "appear[ance]" of sound financial status in order to obtain eligibility to receive in-state business; the Commissioner of Insurance is not charged with investigating the actual financial condition of a prospective surplus lines insurer. N.J.Stat.Ann. 17:22–6.45. In contrast, an admitted or authorized insurer is subject to thorough examination into its financial status "whenever [the commissioner] deems it expedient, ... [and] at least once in five years." N.J.Stat.Ann.

17:29A–7. Admitted and authorized insurers must satisfy the Commissioner that they meet certain capital stock or asset minima prior to commencing business operations in New Jersey, *see* N.J.Stat.Ann. 17:17–6—17:17–8, 17:32–2, while a prospective surplus lines insurer need only furnish a financial statement showing a minimum surplus as to policyholders. N.J.Stat.Ann. 17:22–6.45(c)–(d). Admitted and authorized insurers are required to obtain the Commissioner's approval for proposed rates and rating systems, N.J.Stat.Ann. 17:29A–7, and are forbidden to deviate from those rates once they are approved. N.J.Stat.Ann. 17:22–6.43. Surplus lines insurers, however, may charge any rate the market will bear, so long as it does not fall below the lowest rate offered by an admitted or authorized insurer. N.J.Stat.Ann. 17:22–6.43.

Surplus lines insurers are not entirely free of regulation, however. They are circumscribed in the form of policies they may issue, unless they receive approval from the Commissioner to issue a unique form of policy. N.J.Stat.Ann. 17:22–6.43. They are required to file financial statements with the Commissioner annually as a condition of continued eligibility, Aff. of Jerry Porcelli, ¶ 11 and Exhibit D, and to provide deposits or evidence of a trust fund for the benefit of policyholders and claimants. N.J.Stat.Ann. 17:22–6.45(d). In their initial eligibility applications, they are required to furnish information regarding their licensure in their domiciliary state or country, biographical sketches of officers and directors, certified copies of their charter and by-laws, and various financial statements. N.J.Stat.Ann. 17:22–6.45.

Because of the lesser degree of regulation to which surplus lines insurers are subject in general, they pose a greater potential danger to New Jersey residents. New Jersey's requirement that surplus lines insurers receive all business through surplus lines agents represents a compromise affording New Jersey residents the in-state availability of this coverage when needed, while at the same time protecting state residents from direct solicitation by these relatively unregulated insurers. Surplus lines insurers presumably opt for this status rather than seeking admitted status either because they prefer the lesser regulatory burdens, or because they cannot meet the requirements for admitted status.

## 2. *The Act*

The Ambassador fiasco raised a spectre that had not been addressed previously in the state's regulatory scheme, *viz.*, the insolvency of a surplus lines insurer. The Surplus Lines Insurance Guaranty Fund Act at issue in this litigation was conceived to fill that regulatory gap. It was modelled in large part after the earlier Property Liability Insurance Guaranty Act, N.J. Stat.Ann. 17:30A–1 *et seq.*, which has governed admitted and authorized insurers since 1974.

The Property Liability Insurance Guaranty (PLIG) Act established a Property Liability Insurance Guaranty Association ("Association") to investigate and pay claims of insureds whose insurers had become insolvent. Admitted and authorized insurers were deemed members of the Association as a condition of their continuing authorization to transact business directly with insureds in New Jersey. N.J.Stat.Ann. 17:30A–6. The PLIG Act provided for the development of a Plan of Operation and the selection of a Board of Directors to govern the handling of claims covered by the PLIG Act and the assessment of contributions. N.J.Stat.Ann. 17:30A–7–9. Assessments were to be made as required against each insurer in the proportion that that insurer's net direct written premium for the previous year bore to the equivalent figure for all members. N.J.Stat.Ann. 17:30A–8. Admitted and authorized insurers were permitted to recoup the amount of their contributions from insureds by collecting a premium surcharge according to rules adopted by the Commissioner. N.J.Stat.Ann. 17:30A–16. Claims of insureds were "covered" for the purpose of the PLIG Act even though the insured had not contributed to the Association by means of a surcharge, as long as the insurer was subject to the Act and the insured resided in the state at

the time of the insured event or the property insured was permanently located in the state. N.J.Stat.Ann. 17:30A–5.

Drawing upon this model, the Surplus Lines Guaranty Act ("Act") creates a Fund to pay claims of insureds upon the insolvency of a surplus lines insurer. Surplus lines insurers are deemed members of the Fund as a condition of their continued ·eligibility to receive New Jersey business through in-state surplus lines agents. In contrast to the PLIG Act, however, the Act does not create an association of surplus lines insurers to manage the Fund. Instead, it appoints the Property Liability Insurance Guaranty Association to perform management duties, under the supervision of the Commissioner.

The Act provides for yearly assessments of Fund members, to be proportioned according to each member's previous year's net direct written premium from New Jersey business. Section (6)(a)(2). Yearly assessments are not to exceed four percent of that figure. Section (6)(a)(2). In the event that Fund monies fall short of the amount required to pay "covered claims," the Act authorizes the Fund to borrow up to $10,-000,000 from the monies of the Association at an annual rate of six percent interest to apply toward the Fund's obligations. Section (6)(b). The Act calls for an initial contribution in the amount of four percent of 1983 net direct written premiums, and a one-time initial fee of $25,000 as a condition of continued surplus lines eligibility. Section (6)(a)(1) & (2). There is no explicit recoupment provision.

Disposition of monies contributed since the effective date of the Act was stayed by consent of the parties for sixty days in anticipation of the resolution of the constitutional questions raised by plaintiffs. Failure of a surplus lines insurer to make the required contributions under the Act while continuing to receive New Jersey business in-state would subject those aiding in the transactions in-state to criminal penalties. N.J.Stat.Ann. 17:22–6.37.

### 3. *Constitutional Claims*

The plaintiffs are two surplus lines insurers, Evanston Insurance Company and Appalachian Insurance Company; a New Jersey resident, Mr. Donald Brody, insured by an authorized insurer; and the Risk and Insurance Management Society ("RIMS"), a non-profit organization which includes approximately eighty New Jersey commercial insureds among its members. RIMS purports to represent New Jersey surplus lines insureds. Kempler Aff., ¶ 6.

Plaintiffs challenge the Act on several grounds. First, Evanston and Appalachian claim that the Act violates their fifth and fourteenth amendment rights to due process on the ground that the Act seeks to regulate beyond the state's legitimate jurisdiction. Second, they claim that the delegation of Fund management responsibility to the Association is an unconstitutional delegation of legislative authority to private persons, as well as a violation of due process because of an asserted conflict of interests between Association members and surplus lines insurers. Lastly, Evanston and Appalachian challenge the initial assessment of four percent of each subject insurer's 1983 net direct written premium from New Jersey surplus lines business as a violation of the Contract Clause. Plaintiff Brody, for his part, contends that the Act's authorization of loans from the Association to the Fund at a six percent annual rate of interest amounts to an unconstitutional taking in violation of the fifth amendment. Plaintiff RIMS asserts that enforcement of the Act will result in increased insurance costs to surplus lines insureds and a withdrawal of surplus lines insurers from the New Jersey market. Together, the plaintiffs seek a declaration that the Act is unconstitutional, as well as an injunction preventing its enforcement.

Plaintiffs are joined in their challenge to the Act by the Institute of London Underwriters, which filed a brief *amicus curiae* with the consent of the parties and permission of the court. The *amicus* questions the constitutionality of the Act on two additional grounds. First, it claims that the

Act violates the equal protection clause of the fourteenth amendment because of the differential treatment accorded admitted and authorized insurers in the PLIG Act as compared to surplus lines insurers in the challenged Act. Second, the *amicus* charges that the four percent assessment is unconstitutional as a retrospective deprivation of vested rights.

Defendants are Kenneth Merin, New Jersey's Commissioner of Insurance, Thomas Kean, the Governor of New Jersey, and the Property Liability Insurance Guaranty Association. The state defendants contend that the Act is a proper exercise of New Jersey's legislative powers; that this court is barred by the eleventh amendment from granting relief to plaintiffs insofar as their claims are based on state law and that the delegation of management responsibility to the Association violates no federal constitutional provision because the delegation confers no legislative power; that the Act does not violate the Contract Clause, chiefly because the four percent assessment is not retrospective and therefore does not impair any contract; that the Act does not constitute an unconstitutional taking of property; and, finally, that this court does not have jurisdiction to entertain plaintiffs' challenge to the Act. The Association defends its role under the Act as purely ministerial. It emphasizes the extensive supervision by the Commissioner contemplated in the Act, and cites the ministerial character of its activities administering covered claims pursuant to the Property Liability Insurance Guaranty Act and its current approved Plan of Operation.

Before the court are cross-motions by the parties for summary judgment. Defendants seek summary judgment on all counts. Plaintiffs seek summary judgment on all counts with the exception of Count 2 of the complaint, challenging the delegation of responsibility to the Association. Plaintiffs take the position that the Association's papers have raised an issue of fact as to the extent of the Association's discretionary powers under its Plan of Operation. Plaintiffs therefore oppose the granting of summary judgment on the second count of their complaint.

## DISCUSSION

### I. *Jurisdiction*

As it must, the court will turn first to the jurisdictional questions raised by the state defendants. These defendants challenge this court's jurisdiction on two grounds. First, they contend that there is no "case or controversy" presented here within the meaning of Article III of the United States Constitution because the plaintiffs assertedly have no standing to raise this constitutional challenge to the Act. Second, the state defendants argue that the court has no "federal question" jurisdiction over this matter because it does not "arise under" federal law. For ease of analysis, the court will treat the state defendants' second objection first.

#### a. *Federal Question*

 In the absence of diversity of citizenship among the parties,[1] or some special grant of jurisdiction over a particular matter, a federal court has no jurisdiction to entertain an action unless it "arises under the Constitution, laws or treaties of the United States." 28 U.S.C. § 1331. In general, "[a] suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916). A claim asserted to vindicate a constitutional right unquestionably "arises under" the Constitution. Section 1331 affords no jurisdiction over an action on the basis of such a claim, however, unless the claim "arising under" federal law appears on the face of the plaintiff's well-pleaded complaint. *Louisville & Nashville Ry. Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). That is, a federal court has no jurisdiction under sec-

---

1. Complete diversity of citizenship among the parties is lacking here because plaintiff Donald Brody and the defendants are New Jersey citizens. *See Strawbridge v. Curtiss,* 3 Cranch 267 (1806).

tion 1331 over a matter when the only federal claim appearing in a complaint is asserted solely as a defense to an anticipated claim by the opposing party.

 The requirement that a federal claim appear on the face of a well-pleaded complaint has special implications for declaratory judgment actions. The Declaratory Judgment Act, 28 U.S.C. § 2201, enacted in 1948 to afford a declaratory form of relief in federal lawsuits, was never intended to expand the federal court's jurisdiction. *Skelly Oil v. Phillips Petroleum,* 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1950). Thus, a federal court has no jurisdiction over an action not otherwise arising under federal law simply because it is cast as a suit for declaratory relief. Jurisdiction is lacking where, "but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state-created action." *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 2850, 77 L.Ed.2d 420 (1983) *quoting* 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure, § 2767 at 744–45 (2d ed. 1983); *see also Public Service Comm'n v. Wycoff,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

 Contrary to the plaintiffs' contention, Plaintiffs' Reply Mem. at 4, the requirement that a federal claim appear on the face of a well-pleaded complaint, and the corresponding restriction in declaratory judgment actions, applies without regard to whether the federal claim is constitutional or statutory. *See Louisville & Nashville, supra* (no federal question jurisdiction over fourteenth amendment claims raised only to rebut an anticipated defense). The only claim for declaratory relief plaintiffs assert is their claim for a declaratory judgment that, in essence, various constitutional protections are a defense to the enforcement of the state-law Act against them. Conse-

quently, were this action solely an action for declaratory relief, with no possibility of a valid claim for coercive relief, the rule in *Skelly Oil* would bar this court from entertaining this suit.

 Plaintiffs seek more than only declaratory relief in this action, however. In the final count of their complaint, plaintiffs seek an injunction to restrain the defendant from enforcing the Act on the ground that it is unconstitutional. A suit to enjoin the unconstitutional actions of state officials is certainly one "arising under" federal law and thus properly before this court. *See, e.g., Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Assuming that the plaintiffs' claim for injunctive relief is justiciable, then, the fact that the plaintiffs also seek declaratory relief in this action does not deprive the court of jurisdiction.[2]

### b. *Standing and Ripeness*

The state defendants maintain that the plaintiffs' claim for injunctive relief is not justiciable because none of the plaintiffs has standing to raise this challenge to the Act and, in effect, the challenge is not ripe. According to the state defendants, "[t]he claims of injury by plaintiffs Brody and Risk and Insurance Management Society, Inc. are entirely too speculative to warrant this court's consideration .... With respect to Evanston and Appalachian, no specific harm has been alleged. They have merely stated that, under the Act, they must pay fees and assessments to the Fund. At best, they have intimated that, should they refuse to make these payments, some injury will occur." Defendant's Mem. at 39–40. Plaintiffs, for their part, point out that Evanston has paid $143,000 to the court-appointed escrow agent pending the outcome of this summary judgment motion, and that it will lose

---

**2.** Third Circuit cases dismissing actions that sought solely declaratory relief, or declaratory relief along with non-justiciable claims for injunctive relief are not to the contrary. *See New Jersey State AFL-CIO v. State of New Jersey,* 747 F.2d 891 (3d Cir.1984); *Exxon Corp. v. Hunt,* 683

F.2d 69 (3d Cir.1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983); *Allegheny Airlines, Inc. v. Pennsylvania Public Utility Commission,* 465 F.2d 237 (3d Cir.1972), *cert. denied,* 410 U.S. 943, 93 S.Ct. 1367, 35 L.Ed.2d 609 (1973).

those funds if the Act is upheld. They contend that admitted insureds will suffer a "raid of the admitted fund" to cover the claims of Ambassador's insureds. *See* Plaintiffs' Reply Mem. at 8. They argue that surplus lines insureds, assertedly represented in this action by the Risk and Insurance Management Society, stand to suffer if the Act is upheld because it will "result in a substantial increase in the cost of insurance to surplus lines insureds and a withdrawal from the surplus lines market of certain necessary surplus lines insurers." Aff. of Cecilia Kempler ¶ 6(c).

 In order to establish standing, plaintiffs need not show that they will prevail on their claims for relief, *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 70, 98 S.Ct. 2620, 2628, 57 L.Ed.2d 595 (1978), *citing Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), but only that they have a "personal stake in the outcome." *Id.* 438 U.S. at 72, 98 S.Ct. at 2630, *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The state is incorrect in arguing that the asserted absence of immediate irreparable harm to the plaintiffs, which bears on the question of preliminary relief, somehow also automatically divests the plaintiffs of standing. Plaintiffs need not show immediate irreparable harm to establish standing. Nevertheless, the requirement of a "personal stake" implies both a "distinct and palpable injury." *Id.* 438 U.S. at 72, 98 S.Ct. at 2630, *quoting Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), from the challenged conduct and a " 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Id.*, *quoting Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). In short, to establish standing a litigant must show "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury."

*Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 (1983).

 The court is satisfied that plaintiffs Evanston and Appalachian have demonstrated the requisite injury in fact and likelihood that the requested relief will redress that injury. Evanston and Appalachian both stand to lose $25,000 and the amount of future assessments, or face sanctions for failing to comply with the Act, including loss of their eligibility to conduct business in New Jersey through surplus lines agents. Plaintiffs faced with the choice between direct economic loss or government sanctions clearly demonstrate the requisite "injury in fact." *See Craig v. Boren*, 429 U.S. 190, 194, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (plaintiff had standing to challenge statute which would require her either to suffer economic injury or face sanctions, including loss of business license). The immediacy of the prospect of loss to Evanston and Appalachian precludes any argument that this controversy is not ripe for adjudication, even though the Act has not yet been enforced against them. *Cf. Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (justiciable Article III "case or controversy" presented by challenge to federal election financing law, though not yet enforced against plaintiffs). This is not a case in which state enforcement is doubtful or hypothetical. *Cf. Public Service Comm'n v. Wycoff*, 344 U.S. 237, 240, 73 S.Ct. 236, 238, 97 L.Ed. 291 (1952). Indeed, disposition of monies collected under the Act has only been stayed to permit time for the resolution of this controversy.[3]

 Likewise, plaintiff Brody has standing to challenge the provision of the Act permitting borrowing from Association funds earmarked for his protection as an insured of an authorized insurer. Whether or not Brody's interest in the amount of funds on reserve with the Association for the payment of covered claims constitutes

---

**3.** At the same time, the state has commenced no criminal proceeding against any plaintiff, so the court's exercise of jurisdiction in this action will

not run afoul of the doctrine articulated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny.

"property" within the meaning of the just compensation clause of the fifth amendment, Brody has standing to challenge the constitutionality of the Act's borrowing provisions because his interest in the security of his insurance coverage is within the "zone of interests" sought to be protected by the original PLIG Act. *See Data Processing Service v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1969) (standing exists where "interest sought to be protected by the complaint is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," whether or not complainant has protectible "legal interest"); *also Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1969). Whether or not it constitutes an unconstitutional "taking," the depletion of the Association's reserves constitutes a sufficiently colorable "injury in fact" to establish the adversity between parties required by Article III. *See Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir.1982) (injury-in-fact requirement satisfied by alleging "specific 'identifiable trifle' of injury ... fairly traceable to the defendant's conduct").

Moreover, Brody's claim is ripe for judicial determination. As noted by plaintiffs, the Statement attached to the Act indicates the legislative intent to immediately utilize funds received under the Act—whether from assessments of surplus lines insurers, recovery under Ambassador, or loans received from the Association—to the extent necessary to pay the ten to twelve million dollars of outstanding claims against Ambassador in New Jersey. Even if the prospect of utilization of the borrowing provision were not so immediate, "[t]he prudential considerations embodied in the ripeness doctrine ... argue strongly for a prompt resolution of the claims presented." *Duke Power*, 438 U.S. at 81, 98 S.Ct. at 2635. The court "will be in no better position later than [it is] now to decide this question," *id.* 438 U.S. at 81, 98 S.Ct. at 2635 (quoting cases) and delayed resolution would "frustrate one of the key purposes," *id.*, of the Act—to assure surplus lines insureds of the prompt payment of their covered claims. The court thus will entertain Brody's claim.

Plaintiff RIMS does not have standing to challenge the Act, however. While "[i]t is clear that an organization whose members are injured may represent those members in a proceeding for judicial review," *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972), neither the organization nor its members may obtain judicial review of a statute where neither can demonstrate the requisite "injury in fact." *Id.* The injury which RIMS claims its member surplus lines insureds stand to suffer is an increase in the cost of surplus lines insurance and a withdrawal of key surplus lines insurers from the New Jersey market, with resulting economic injury. Kempler Aff., ¶ 6(c). In essence, RIMS claims that the Act is not an economically sound piece of legislation, and that it will produce adverse economic consequences within the surplus lines market. This sort of widespread consequential "injury" is not within this court's competence to assess, nor within its power to remedy, however. The federal judiciary is not empowered "to sit as a 'superlegislature to weigh the wisdom of legislation'...." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1977) (quoting cases). Where the only "injury" adduced by a plaintiff to establish its standing to sue is an "injury" beyond the competence of the court to assess, standing to sue does not exist.

Because this court has Article III jurisdiction over the coercive claims for injunctive relief by Evanston, Appalachian, and Brody, it may exercise jurisdiction over those plaintiffs' claims for declaratory relief as well. The court does not have jurisdiction over any claims asserted by RIMS. Since those claims were apparently only duplicative of the claims asserted by the other plaintiffs, however, the court's lack of jurisdiction over RIMS' claims does not affect the court's consideration of the statute on the merits.

## II. The Constitutional Claims

Having concluded that this court has jurisdiction to entertain all claims raised by the plaintiffs, the court will proceed to consider the claims on the merits.

### a. Due Process

Plaintiffs Evanston and Appalachian claim that the police power of the State of New Jersey does not extend so far as to permit the state to regulate eligible surplus lines insurers as provided for in the Act. Indeed, they contend that "the State of New Jersey has legislated eligible surplus lines insurers out of the reach of its police power ...", Plaintiffs' Mem. at 11, because the state's surplus lines law "is completely restrictive and prohibits surplus lines insurers from enjoying any benefits in the State." Id. at 21. Plaintiffs do not question the state's interest in regulating surplus lines insurers as provided in the Act, nor do they argue that the state would never have the power to so regulate them. Rather, they claim that the Act's regulatory requirements violate principles of fundamental fairness because of the context of "exclusionary" surplus lines laws in which they are sought to be imposed.

Plaintiffs contend that they have no presence in New Jersey under New Jersey's own surplus lines law. They emphasize that surplus lines insurers are necessarily foreign corporations; that they are prohibited from advertising or otherwise attempting to deal directly with prospective insureds in the state; that they are subject to certain restrictions on their access to courts;[4] that they are not permitted to insure risks unless the risks have been declared eligible for export after a determination that there is no market for them among admitted and authorized insurers; and that they receive New Jersey business only out of state, when it is exported to them by surplus lines agents in-state. Because they "simply lack any relationship with New Jersey," Plaintiffs' Mem. at 26, under this statutory scheme, they contend that they receive no benefit from the state which might justify the regulatory burden of the Act. They complain as well about the asserted unfairness of requiring fiscally responsible surplus lines insurers to pay the consequences of other insurers' financial irresponsibility in light of the state's minimal oversight of surplus lines insurers.

Plaintiffs acknowledge that the assessments provided for in the Act are not a tax,[5] yet they claim that these contributions are enough akin to a tax that the Supreme Court authority defining due process restrictions on a state's power to tax is controlling here. They read these cases as exempting them from taxation by New Jersey on the grounds that they do not have sufficient contacts with the state to warrant its imposing any tax burden on them. Indeed, they claim that the state itself has implicitly recognized this limitation upon its power to tax by imposing tax burdens in connection with surplus lines insurance only upon surplus lines agents and insureds, but not upon the insurers themselves. See N.J.Stat.Ann. 17:22–6.59, 6.64.

The state contends that the state regulation at issue here is subject to lesser due process restrictions than would be an effort to tax surplus lines insurers, relying on the leading Third Circuit case, Aldens v. Packel, 524 F.2d 38, 43 (3d Cir.1975) (Pennsylvania's imposition of its consumer credit law on an out-of-state mail order company not subject to the "special due process scrutiny" required in state tax collection cases). In any event, the state argues, the regulation at bar does not exceed due process limits even under the stronger light of the tax cases. This court agrees.

---

4. Plaintiffs' statement that New Jersey denies surplus lines insurers access to state courts "except as such actions may relate to policies issued by them," Plaintiffs' Mem. at 26, is somewhat misleading. In fact, New Jersey merely prohibits surplus lines insurers from using its courts to enforce any right arising out of insurance transactions not in accordance with the state's surplus lines law. N.J.Stat.Ann. 17:22–6.39.

5. Indeed, if the Act did levy a tax, jurisdiction over this matter would be questionable in light of the Tax Injunction Act, 28 U.S.C. § 1341.

Presumably as a result of the spread of interstate business, virtually all Supreme Court decisions in the past few years concerning the due process limits on a state's power to tax foreign or interstate corporations also treat concerns relating to the commerce clause. The doctrine which has developed blends the concerns of both constitutional provisions. *See, e.g., Norfolk & W.R. Co. v. Tax Comm'n.*, 390 U.S. 317, 325 n. 5, 88 S.Ct. 995, 1001 n. 5, 19 L.Ed.2d 1201 (1968). A state's power to tax the income of a foreign corporation under both the due process and commerce clauses depends on the existence of "a 'minimal connection' or 'nexus' between the interstate activities and the taxing state, and a rational relationship between the income attributed to the state and the intrastate values of the enterprise." *Container Corp. of Am. v. Franchise Tax Board*, 463 U.S. 159, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545 (1983) (quoting cases).

The due process concern reflected in this two-prong test is that a state's tax burden should not exceed the benefit which the party taxed has received from the state. A state "is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 444, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1940); *see also Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 624–25, 101 S.Ct. 2946, 2957, 69 L.Ed.2d 884 (1980). The controlling question is "whether the State has exerted its power in proper proportion to [a business'] activities within the State and to [the business'] consequent enjoyment of the opportunities and protections which the State has afforded ...," *Montana*, 453 at 625, 101 S.Ct. at 2957, *quoting General Motors Corp. v. Washington*, 377 U.S. 436, 440–41, 84 S.Ct. 1564, 1567–68, 12 L.Ed.2d 430 (1964). The Supreme Court's two-prong test, most recently articulated in *Container Corp., supra,* protects business-es from state tax burdens which are not "rationally related to local activities substantial enough to warrant compensation to the state." L. Tribe, American Constitutional Law, at 352 (1978).

Plaintiffs Evanston and Appalachian essentially contend that neither prong of the test is satisfied here, although they do not articulate their argument in terms of the two-prong test. Relative to the first prong, plaintiffs argue vigorously that the requisite "minimal connection" between themselves and the State of New Jersey is lacking because of the restrictions in the state's surplus lines law. Relative to the second prong, they claim that the transactions at issue—the writing of policies—occurs solely out of state at the offices of the surplus lines insurers, and that, in essence, the premiums do not represent an "intrastate value" which could form the basis for a tax. In addition, they argue that the one time $25,000 initial fee bears no rational relation to any value received from the state. A careful consideration of these two requisites for the imposition of a state tax in this context, however, confirms that the Act would meet due process concerns even if it involved the imposition of a tax rather than the assessment of contributions to a guaranty fund.

### 1. Minimal Connections

The leading case defining the minimal connection required between an out-of-state business and a state before the state may impose tax liability is *National Bellas Hess v. Dept. of Revenue*, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967). In *National Bellas Hess*, the State of Illinois attempted to require the plaintiff to collect and to pay to the state a use tax imposed upon consumers who purchased the plaintiff company's goods for consumption within the State of Illinois. National Bellas Hess was a mail order house operating out of Northern Kansas City, Missouri. The company did not

maintain in Illinois any office, distribution house, sales house, warehouse or

any other place of business; it [did] not have in Illinois any agent, salesman, canvasser, solicitor or other type of representative to sell or take orders, to deliver merchandise, to accept payments, or to service merchandise it sells; it [did] not own any tangible property, real or personal, in Illinois; it [had] no telephone listing in Illinois and it [had] not advertised its merchandise for sale in newspapers, on billboards, or by radio or television. in Illinois.

*Id.* 386 U.S. at 754, 87 S.Ct. at 1390. The only contacts the company had with Illinois were via mail or common carrier. National sent out twice yearly catalogues and occasional flyers to customers throughout the country, including Illinois. Orders for merchandise were "mailed by the customers to National and ... accepted at its Missouri plant. The ordered goods [were] then sent to the customers either by mail or by common carrier." *Id.* at 754–55, 87 S.Ct. at 1390.

The Supreme Court found that Illinois' imposition of use tax liability on National violated both the due process clause and the commerce clause. Due process required "some definite link, some minimum connection, between a state and the person, property, or transaction it seeks to tax," *id.* at 756, 87 S.Ct. at 1391 (quoting cases), the Court reasoned. That link was not present where a seller's "only connection with customers in the State is by common carrier or the United States mail." *Id.* at 758, 87 S.Ct. at 1392.

▮▮▮ Notwithstanding *National,* a state does have the power to impose tax liability on a seller if it has virtually any other contact with the state. The Court in *National* mentioned, for example, that taxation was appropriate where "sales were arranged by local agents in the taxing state ..., *Felt & Tarrant Co. v. Gallagher,* 306 U.S. 62 [59 S.Ct. 376, 83 L.Ed. 488]; *General Trading Co. v. Tax Comm'n,* 322 U.S. 335 [64 S.Ct. 1028, 88 L.Ed. 1309] ..., where [a] mail order seller maintained local retail stores, *Nelson v. Sears, Roebuck & Co.,* 312 U.S. 359 [61 S.Ct. 586, 85 L.Ed.

888]; *Nelson v. Montgomery Ward,* 312 U.S. 373 [61 S.Ct. 593, 85 L.Ed. 897]," and where a seller had ten " 'salesman' conducting continuous local solicitation in [the taxing state] and forwarding the resulting orders from the State to [the corporation's domiciliary state] for shipment of the ordered goods [citing *Scripto Inc. v. Carson,* 362 U.S. 207, 211 [80 S.Ct. 619, 621, 4 L.Ed.2d 660] (1960)." *National Bellas Hess,* 386 U.S. at 757–58, 87 S.Ct. at 1391–92. The in-state agents or offices need not be the source of the income taxed in order to satisfy due process. *See National Geographic Soc. v. California Bd. of Equalization,* 430 U.S. 551, 555–62, 97 S.Ct. 1386, 1389–93, 51 L.Ed.2d 631 (1977).

▮▮▮ The critical threshold for triggering a state's power to tax is thus whether or not the out-of-state enterprise stations agents or establishes offices to conduct any business in the taxing state, whether or not that in-state business is related to the income taxed (although the amount of the tax must be related to intrastate values). Where an out-of-state corporation "avails itself of the substantial privilege of doing business in the state," *J.C. Penney,* 311 U.S. at 444–45, 61 S.Ct. at 249–50, the state may exact compensation for the benefits it provides in supporting those activities.

At the outset, before applying this test in the context of surplus lines insurers, the court notes that the in-state presence of the various eligible surplus lines insurers is widely divergent. The state defendants point out that Ambassador Insurance Company, whose insolvency spurred passage of the Act, for example, had its principle place of business in New Jersey and derived one quarter of its income from premiums written in the state. Defendant's Mem. at 9. Other surplus lines insurers maintain offices in New Jersey (Aff. of Jerry Porcelli, ¶ 15), or make use of companies located in New Jersey to inspect risks and adjust claims. *Id.,* ¶ 16. Nothing in New Jersey's surplus lines law precludes a surplus lines insurer from maintaining offices or agents in the state to engage in non-insur-

ance business. Moreover, the surplus lines law authorizes surplus lines insurers to invest in-state surplus lines agents with binding authority to contract on the insurer's behalf in insurance transactions. N.J. Stat.Ann. 17:22–6. Several insurers have done so. (Porcelli Aff., ¶ 17).

The degree of physical presence each surplus lines insurer maintains in the state, whether through an in-state office or an agency agreement with surplus lines agents, obviously affects the power of the state to tax or regulate the corporations.[6] For the purposes of these motions, however, the court will assume only the most limited of contacts: that plaintiff surplus lines insurers have no offices or employees in the state and transact no business of any kind except to accept risks exported through surplus lines agents with no binding authority to contract on behalf of the insurer. Even assuming only the most minimal of contacts, however, the degree of connection required between a surplus lines insurer and the state is sufficient to justify the imposition of a tax on surplus lines premiums written through surplus lines agents.

In analyzing plaintiffs' connection with the state, it is significant to note that plaintiffs are in an anomolous position vis a vis other corporations engaged in interstate commerce. Ordinarily, a multistate business challenging an assessment requirement, such as the one at issue here, would include a claim for relief based on the commerce clause. Commerce clause claims are notably absent in this insurance case, however. Because Congress explicitly delegated the responsibility for regulating the insurance industry to the states, in the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*, standards that would normally apply to restrict the states' power to regulate interstate businesses under the commerce clause do not apply in the insurance con-

text. Absent the McCarran-Ferguson Act, the commerce clause might well preclude a state from designating specific agents through which an out-of-state insurer could be constrained to conduct business, *cf. Dean Milk Co. v. City of Madison*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (city could not forbid local sale of milk on ground that it was not pasteurized at local, municipally approved plant), or from setting minimum rates for the out-of-state insurers. *Cf. Baldwin v. Seelig*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (statute prohibiting purchase of milk from out-of-state sellers at below fixed minimum price unconstitutional). Because the commerce clause does not apply to the transaction of insurance business in New Jersey, however, the state's extensive regulation, rather than the companies' own preferences, has shaped the manner in which insurance companies do business in the state.

As a consequence of New Jersey's insurance regulations, surplus lines insurers are required to maintain a minimal connection with the state which, coincidentally, is sufficient to trigger the state's power to tax. Under New Jersey's insurance law, a surplus lines insurer *cannot* maintain the less-than-minimal connection with the state that National Bellas Hess was able to maintain with the State of Illinois. Foreign insurers are forbidden to advertise or solicit insurance business in New Jersey "by mail or otherwise," except as provided in the Insurance laws. N.J.Stat.Ann. 17B:23–9. A mail order insurance business akin to the mail order operation of National Bellas Hess is simply illegal in New Jersey. Surplus lines insurers thus have no choice but to either absent themselves completely from the state, or to comply with all of New Jersey's regulatory requirements for the transaction of surplus lines business.

---

**6.** Indeed, surplus lines insurers that maintain offices in New Jersey but receive surplus lines premiums out of state are in virtually an identical position with regard to the state's power to impose tax liability as that of the National Geographic Society in *National Geographic, supra* (State of California could impose use tax liability on National Geographic Society for mail order sales to state residents where society maintained two advertising offices in the state, even though the offices had no direct relation to the out-of-state sales).

A state may, consistent with a valid regulatory scheme, require an out-of-state corporation receiving business from the state to maintain a minimal connection with the state sufficient to trigger the corporation's susceptibility to taxation by the state. *Heublein, Inc. v. South Carolina Tax Comm'n,* 409 U.S. 275, 93 S.Ct. 483, 34 L.Ed.2d 472 (1972). In *Heublein,* the Supreme Court considered the propriety of a state tax imposed on an out-of-state liquor seller. South Carolina required all producers of alcohol who sought to ship alcoholic beverages into the state to have a resident representative with no interest in any local liquor business.[7] Prior to any shipment, the producer was required to mail a copy of the invoice showing the quantity and price of items shipped and a copy of the bill of lading to a regulatory commission. The representative was required to furnish a copy of the invoice to the commissioner upon delivery and to obtain the commissioner's permission to transfer the goods to a wholesaler. But for these valid regulatory requirements, Heublein's connection with the state would only have consisted of shipping its goods into the state, a connection too minimal to justify taxation. *Cf. National Bellas Hess, supra.* The Supreme Court found that Heublein's action in sending its products to the local representative, who transferred them within the state to a wholesaler, constituted sufficient in-state activity to trigger the state's power to tax, however. Moreover, the court found no infirmity in the fact that the state had, through its regulatory requirements, compelled Heublein to have more of a presence in the state than it would otherwise have had, thus subjecting it to taxation. 409 U.S. at 279, 93 S.Ct. at 486.[8]

7. South Carolina's regulations were not improper under the commerce clause because they constituted a valid exercise of the state's powers under the twenty-first amendment, which leaves states "totally unconfined by traditional commerce clause limitations when [they] restrict the importation of intoxicants destined for use, distribution, or consumption within its borders." *Id.* 409 U.S. at 283, 93 S.Ct. at 489, *quoting Hostetter v. Idlewild Bon Voyage Liquor Corp.,* 377 U.S. 324, 330, 84 S.Ct. 1293, 1296, 12 L.Ed.2d 350 (1964).

8. The Court's opinion in *Heublein* was explicitly couched as a construction of 15 U.S.C. § 381, rather than as an analysis of the due process clause. Yet in light of the history of that legislation, the Court's opinion must be viewed as an implicit statement that the South Carolina tax comported with the minimum requirements of due process.

15 U.S.C. § 381 is an exercise of congressional power under the commerce clause limiting the power of the states in imposing taxes on income derived from interstate commerce. *See Int'l Shoe Co. v. Cocreham,* 164 So.2d 314, 246 La. 244, *cert. denied,* 379 U.S. 902, 85 S.Ct. 193, 13 L.Ed.2d 177 (1964). It divests states of the power to impose net income taxes on income derived from within the state by any person from interstate commerce if the person's only business activity in the state consists of soliciting orders for tangible personal property, where the orders are sent outside the state for approval or rejection, and filled by shipment or delivery from a point outside the state.

The statute was enacted in direct response to the Supreme Court's decision in *Northwest Portland Cement Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959). *See Heublein,* 409 U.S. at 279, 93 S.Ct. at 486. In that decision, the Court upheld several state taxes on income derived from interstate business in the face of both commerce clause and due process challenges. It concluded that "net income from the interstate operation of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities with the taxing state forming a sufficient nexus to support the same." *Northwest Portland Cement,* 358 U.S. at 452, 79 S.Ct. at 359. According to the Court in *Heublein,* "Congress promptly responded to the 'considerable concern and uncertainty' and the 'serious apprehension in the commercial community generated by [Northwest Portland Cement]' in enacting ... 15 U.S.C. § 381 within seven months." *Heublein,* 409 U.S. at 279–80, 93 S.Ct. at 486–87. Interstate businesses were apparently concerned "as to the amount of local activities within a State that will be regarded as forming a sufficient 'nexus', that is, connection, with the state to support the imposition of a tax on net income from interstate operations and 'properly apportioned to the state.'" *Id.* 409 U.S. at 280 n. 5, 93 S.Ct. at 487 n. 5, quoting S.Rep. No. 658, 86th Cong. 1st Sess., 2, at 2–3. Congress thus exercised its regulatory power under the commerce clause to limit the zone of interstate business activity in which the states could impose a tax. The statute effectively raised the standard for state imposition of taxes on interstate commerce above that set by the commerce clause or, coincidentally, by the due process clause. Thus, in finding the South Carolina tax proper under section 381, the Supreme

The Supreme Court's decision in *Heublein* has a dual significance here. First, it upheld a state tax on a corporation whose salient connections with the taxing state were remarkably similar to those of the plaintiffs here to the State of New Jersey. Second, it did so even though the nature of the corporation's connection with the state was solely a product of state regulation.

Like the State of South Carolina in *Heublein*, New Jersey has required surplus lines insurers to channel their business in the state through designated local agents whose function, in part, is to satisfy the state's regulatory requirements. Surplus lines agents perform a number of services for surplus lines insurers which are required by the New Jersey regulatory scheme as a condition upon the insurers' receipt of in-state New Jersey business. As an initial matter, surplus lines agents must sponsor the applications of surplus lines insurers for eligibility to receive in-state New Jersey business. Thereafter, the surplus lines agent handles the affidavits required for a risk to be declared exportable, provides evidence of coverage to the insured and to the Commissioner, and files a copy of the issued policy with the Commissioner. The agent also performs such non-regulatory functions on behalf of surplus lines insurers as directing prospective insureds to specific insurers named on the white list, and negotiating coverages with the insured. While the agent is not an employee or general agent of the insurer, he or she performs a sufficient number of agency functions in furtherance of the insurers' operations within the regulatory scheme to elevate the surplus lines insurer over the threshold of susceptibility to state taxation.

The rationale behind the "in-state agent" test of a state's power to tax a foreign corporation is that an agent acting within a state takes advantage of the "benefits which [the state] has conferred by the fact of being an orderly, civilized society." *J.C. Penney*, 311 U.S. at 444, 61 S.Ct. at 250. Because the state has provided this benefit, it has the power to tax. *Heublein* stands for the proposition that a state may, pursuant to a valid regulatory scheme, *require* a foreign corporation to take advantage of the state's benefits, if the corporation is to receive any business from the state at all, and may levy a tax against the corporation because of the benefits provided. In its regulatory scheme, New Jersey has required that any foreign insurer seeking to receive in-state surplus lines business must do so through the mechanism of surplus lines agents. Because these agents, in their operations, take advantage of benefits conferred by the state, the state may tax the insurers which have sought their services.

This conclusion is in complete harmony with the principles of fundamental fairness invoked by plaintiffs. The plaintiffs have voluntarily and actively sought to receive business in New Jersey. They have not only applied to the state for eligibility status, but have sought out surplus lines agents to sponsor them. Unlike the defendants in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) and *Kulko v. Superior Court of Calif.*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), cited by plaintiffs, the plaintiffs have purposefully sought out benefits from the State of New Jersey—namely, the ability to receive business through the mechanism of surplus lines agents. There would be no unfairness in

Court impliedly found it proper under the minimal due process standard as well. That the due process implications were inescapably before the Court is clear in view of the Court's explicit acknowledgement of the decisional impetus for section 381, and the due process analysis conducted in *Northwest Portland Cement*.

Section 381 itself is of no significance in this action because the assessments sought to be imposed under the Act are not, after all, a tax.

In any event, section 381 is superseded by the McCarran Act, 15 U.S.C. § 1012(b) ("No act of Congress shall be construed to invalidate ... any law enacted by any state ... which imposes a fee or tax upon [the business of insurance]"). The statute does illustrate the manner in which Congress could, if it chose, limit the impact on interstate commerce of decisions such as this one by, perhaps, limiting the delegation of regulatory power in the McCarran Act.

taxing them for those benefits purposefully sought.[9]

2. *Rational Relation to Intrastate Value*

■ Even if the plaintiffs have a sufficient minimal connection to the state to justify imposition of a tax, any tax levied would have to bear a "rational relationship ... [to] the intrastate values of the enterprise." *Container Corp.*, 103 S.Ct. at 29–40. In other words, the state "may not tax value earned outside its borders." *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 315, 102 S.Ct. 3103, 3109, 73 L.Ed.2d 787 (1982). Thus, a corporation may not be taxed even by a state in which it is licensed to do business on income that bears no relationship to values of the corporation in the state. *See, e.g., Connecticut General Life Insurance Co. v. Johnson*, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 (1938) (State of California could not tax Connecticut corporation on basis of premiums earned under reinsurance contracts executed in Connecticut which happened to reinsure other insurance companies against losses on California policies). *American Oil Co. v. Neill*, 380 U.S. 451, 85 S.Ct. 1130, 14 L.Ed.2d 1 (1965) (mere fact that Utah oil company had a licensed dealer in Idaho did not justify Idaho excise tax on shipment of oil delivered f.o.b. Salt Lake City pursuant to contract made with government agency in Seattle).

■ Plaintiffs suggest that the premiums they receive on New Jersey surplus lines policies are not values earned in the state because their business is assertedly conducted out-of-state. Plaintiff's Mem. at 25. This suggestion need not detain the court, however. Plaintiffs receive premiums from New Jersey residents pursuant to insurance contracts negotiated in New Jersey and entered into between the resident and the insurer. The coverages plaintiffs provide are not delivered "free on board" the insurers' out-of-state offices, as plaintiffs seem to suggest. Nor do the plaintiffs have any separate contract with their surplus lines agents akin to a reinsurance contract; their contracts are with the resident insureds, and they insure risks located in New Jersey. The net direct written premiums upon which the assessment is based are thus obviously rationally related to an intrastate "value": the risk covered. In any event, states may constitutionally tax premiums paid on insurance policies insuring risks located within the state even when the policy was written outside of the state where it appears that the risks may require adjustment and the future activities of agents in the state. *Compania de Tobaco v. Collector*, 275 U.S. 87, 98, 48 S.Ct. 100, 104, 72 L.Ed. 177 (1927), *cited in Connecticut General*, 303 U.S. at 82, 58 S.Ct. at 439. *See also Howell v. Rosecliff Realty*, 52 N.J. 313, 245 A.2d 318 (1968) (New Jersey could tax premiums paid on policy issued out-of-state absent explicit provision that policy would be performed out-of-state). The tax may be measured by the premiums collected, "including those mailed to the home office without the state." *Connecticut General*, 303 U.S. at 82, 58 S.Ct. at 439, *citing Equitable Life Insurance Society v. Pennsylvania*, 238 U.S. 143, 35 S.Ct. 829, 59 L.Ed. 1239 (1914).[10]

---

**9.** For similar reasons, plaintiffs' complaint that the Act unfairly holds surplus lines insurers to account for the fiscal irresponsibility of others is unconvincing. Surplus lines insurers may choose whether or not to incur the initial assessment and the risk of future assessments under the Act. If they choose to continue to receive business in New Jersey through surplus lines agents, there is no unfairness in requiring them to contribute to a fund providing some security to the New Jersey residents from whom they profit.

**10.** The fact that New Jersey currently collects its surplus lines premium taxes through surplus lines agents or insureds is not an "admission" by the state that it has no power to collect such taxes from the insurer. Given the fact that surplus lines insurers necessarily have the requisite "minimal connection" with the state to warrant the imposition of tax liability, the state may tax income rationally related to intrastate values, namely, the insurers' net premiums. The state might well conclude that such taxes are more easily collectible from individuals in-state, such as insureds and agents, and legislate accordingly. By the same token, the fact that surplus lines insurers were excluded from the Property Liability Insurance Guaranty Act, *see Railroad Roofing v. Financial Fire & Cas. Co.*, 85

Likewise, the one-time initial $25,-000 contribution required under the Act rationally relates to an intrastate value, namely, the privilege of continued surplus lines eligibility. In light of the regulatory power delegated to the states under the McCarran Act, there is no question that New Jersey could prohibit an insurer from receiving in-state New Jersey business altogether. It follows that New Jersey may exact payment for the privilege of doing what it has the power to forbid. *See Atlantic & Pacific Tea Co. v. Grosjean*, 301 U.S. 412, 426, 57 S.Ct. 772, 777, 81 L.Ed. 1193 (1937) ("Whatever a state may forbid or regulate it may permit upon condition that a fee be paid in return for the privilege"). Moreover, the state is free to select its own measure for the value of the privilege extended. *Atlantic Refining Co. v. Virginia*, 302 U.S. 22, 26–27, 58 S.Ct. 75, 77, 82 L.Ed. 24 (1937). State privilege taxes are not unconstitutional when imposed as a one-time initial fee upon corporations seeking in-state business when the corporations have not already acquired substantial property in-state, or made other expenditures relating to the business taxed. *Id.* 302 U.S. at 32–33, 58 S.Ct. at 80.

In sum, there would be no due process violation had New Jersey imposed a tax on the plaintiffs in equivalent dimension to the assessments provided for under the Act. Where, as here, the state is not seeking "to export any duty toward its treasury," *Aldens v. Packel*, 524 F.2d at 44, but only attempting to protect New Jersey residents from the insolvency of the surplus lines insurers who profit from them, its regulatory solution is not subject to the special due process scrutiny of a tax assessment. *Id.* Given that the Act survives the heightened due process scrutiny applicable to tax statutes, it is clearly constitutionally sound on this ground.

b. *Unconstitutional Delegation*

In addition to attacking the Act generally as a violation of substantive due process, the plaintiffs challenge the Act as an unconstitutional delegation of authority to the Association to manage the Surplus Lines Insurance Guaranty Fund. Plaintiffs' objection appears to have two facets: first, according to plaintiffs, the New Jersey State Legislature's delegation of administrative authority to the Association constitutes an unconstitutional delegation of "legislative" authority to a private association; second, plaintiffs contend, the Act offends due process because of an inherent conflict of interest in the Association's management of a Fund to which only surplus lines insurers contribute.

The state defendants contend that plaintiffs' first objection to the delegation of "legislative" authority to the Association is solely a matter of state law and, as such, is not within this court's power to remedy. Indeed, it is true that the state legislature's choice of how to delegate its power in light of the New Jersey State Constitution is, as the state defendants contend, a matter of state law, absent any independent violation of the United States Constitution. *Highland Dairy Farms v. Agnew*, 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937) ("How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself"). Moreover, as the state defendants point out, this court has no authority to order injunctive or declaratory relief against state officers solely on the grounds of state law. *Pennhurst State School v. Halderman*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Eleventh amendment bars federal courts from ordering state officials to conform their conduct to state law).

Nevertheless, the Act's delegation of authority to the Association raises at least the possibility of a violation of the federal Constitution independent of any violation of New Jersey's Constitution. The delegation by a state legislature of un-

N.J. 384, 427 A.2d 66 (1981), does not bar the Legislature from enacting a separate act which

applies specifically to surplus lines insurers.

checked legislative power to a private entity can amount to a violation of the due process and equal protection clauses of the fourteenth amendment. *Prudential Prop. & Casualty Co. v. Ins. Comm'n,* 534 F.Supp. 571 (D.S.C.1982), *aff'd,* 699 F.2d 690 (4th Cir.1983); *see also* L. Tribe, *American Constitutional Law,* 290–91 (1978) (delegation of legislative power to private parties is disfavored). A delegation of management authority is not unconstitutional where the exercise of authority is subject to governmental oversight, however. *Prudential Prop.,* 534 F.Supp. 571, 580 (delegation of regulatory authority to private Reinsurance Facility not unconstitutional where Governing Board of facility is subordinate to state Insurance Commissioner); *First Jersey Securities, Inc. v. Bergen,* 605 F.2d 690, 697 (3d Cir.1979) (delegation of disciplinary authority to Nat'l Association of Sec. Dealers not unconstitutional where exercise of authority subject to Securities & Exchange Comm'n oversight).

▮ In this case, the Insurance Commissioner is given sufficient supervisory control over the Association's activities to relieve any constitutional infirmity. Under the Act, the Association is authorized to "exercise all of the powers vested in the fund under this Act, and such other powers as may be necessary or appropriate to the fulfilling of its responsibilities under this act." Section 4. At all times, however, the Fund "shall be subject to the examination and regulation by the Commissioner." The Association's Plan of Operation is also subject to the Commissioner's approval. N.J. Stat.Ann. 17:30A–9.

Moreover, the powers delegated to the Fund under the Act are peculiarly non-legislative, as distinct from those powers the Act reserved to the Commissioner. In general, the Fund is delegated the power to investigate and adjust, or contest, claims; to pay administrative expenses; and to contract as required to carry out the Act. In short, it is delegated responsibilities which are very much within the province of an insurer's usual activities, that is, responsibilities within the special expertise of Association members. At the same time, these duties all relate to the assessment and disposition of individual claims, rather than to the promulgation of general rules. The Commissioner alone is responsible for: (1) adjusting payments overall for covered claims based on monies in the Fund, § 5(a)(1); (2) determining the amount of money to be refunded to member insurers when assessments exceed the needs of the Fund, § 5(b)(4); (3) determining the amount to be assessed in addition to the initial $25,000 contribution, and adjusting the amount of that assessment, § 6(a)(2); (4) approving any payment schedule for monies borrowed from the Property Liability Insurance Guaranty Fund, § 6(b). Delegating quasi-adjudicative authority over individual claims to private parties is not unconstitutional *per se. Cf. Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) (delegation to private insurance carriers of administrative authority over payment of Medicare claims out of Government Trust Fund monies, including authority to review and pay or oppose claims, and to conduct hearings, not violation of claimants' due process rights). If the delegation of authority to adjust claims to a private party does not offend the claimant's rights, surely it does not offend the rights of the plaintiffs.

The real thrust of plaintiffs' objection to the Association's role with regard to the Fund is not based on the Association's private character, however. Plaintiffs do not suggest that the Association's management of its own monies under the Property Liability Insurance Guaranty Fund Act is improper. Indeed, they propose as a solution to their objection that another private group, surplus lines insurers, be vested with management authority over the Fund. Although their objection is couched in terms emphasizing the privateness of the Association, the heart of their concern is rather a perceived conflict of interest between the Association and surplus lines insurers.

The court, however, perceives no such conflict. The mere fact that members of the Association are involved in the insurance industry does not make the delegation of authority to them a denial of due process. *See Republic Industries v. Teamsters Joint Council,* 718 F.2d 628, 640 (4th Cir.1983) (no per se denial of due process on ground that trustees of Pension Benefit Guaranty Corp., charged with determination of employer's "withdrawal liability" under Multiemployer Pension Plan Act of 1980, were chosen by entities with an interest in the fund managed by the Corporation). Indeed, to bar potential trustees automatically from the management of a fund in the industry in which they are participants would "deny the fund valuable expertise." *Id.* Neither do philosophical differences alone create a constitutionally offensive conflict of interest. Rather, only some tangible adversity of interests, such as a "personal financial stake in the matter in controversy," *Gibson v. Berryhill,* 411 U.S. 564, 571, 93 S.Ct. 1689, 1694, 36 L.Ed.2d 488 (1973), will reach the level of a redressable conflict of interest.

The plaintiffs concede, however, that Association members are not in direct competition with surplus lines insurers. Letter from Cecilia Kempler, 11/5/84, at 3. They cite only an historical hostility on the part of admitted insurers toward surplus lines insurers as grounds for invalidating the Act. *Id.* This asserted hostility is simply not sufficient, by itself, to warrant overturning the New Jersey Legislature's choice of claims managers under the Act.

First of all, the Association is "[a] fiduciar[y] and [is] required to act as such." *Republic Industries,* 718 F.2d at 640; *see also Textile Workers Pension v. Std. Dye & Finishing,* 725 F.2d 843, 855 (2d Cir.

1984) (where trustees of fund were required by law to serve the fund impartially, i.e., "without regard to whether they were appointed by labor or management ..." there was no "unfairness" in the legislature's decision to delegate discretionary responsibility to trustees and to treat their determination as presumptively correct). Moreover, this court can find no provision in the Act which would allow Association members to take advantage of their position to the detriment of surplus lines insurers, even if they had the desire to do so. The Commissioner alone is vested with all power to determine assessments, as described above. The Commissioner alone has authority to impose sanctions on individual surplus lines insurers for non-compliance with the Act. §§ 7, 11. The Association's only real authority is in the processing of claims, and even that is subject to the Commissioner's oversight. Given the fact that any shortfall in Fund monies is to be made up out of the Association's own monies, moreover, it is difficult to see what incentive the Association could have ever to abuse its authority by, for instance, overevaluating claims.[11]

In determining that the Fund should be managed by the Association, the New Jersey Legislature no doubt considered the Association's expertise, its record in handling monies under the Property Liability Insurance Guaranty Act, and its relative availability to handle such duties within the state. Plaintiffs have articulated no concrete adversity of interest between the Association and surplus lines insurers which poses the potential for disrupting the fair operation of the Fund and overriding these legislative considerations. Defendants claim, therefore, that there is no conflict of

---

11. The Act simply does not invest the Association with the type of legislative veto power that was invalidated in the two cases chiefly relied upon by plaintiffs, *Group Health Insurance of New Jersey v. Howell,* 40 N.J. 436, 193 A.2d 103 (1963) (statute providing in effect that corporation must obtain approval of State Medical Society to transact medical services business in state constituted unconstitutional delegation of legislative power to private persons), and *Group*

*Health Insurance of New Jersey v. Howell,* 43 N.J. 104, 202 A.2d 689 (1964) (same for statute requiring "approval" of fifty-one percent of practicing physicians in county). The Act explicitly grants to the Commissioner general authority to regulate the activities of the Fund, and requires annual financial reports from the Association to facilitate that regulation. Section 12.

interest of constitutional proportions in the Act's delegation of administrative responsibility to the Association as a matter of law. This court agrees. While it might have been wiser of the Legislature to include surplus lines insurers as managers of the Fund, there is no constitutional infirmity in its decision not to do so. Because the powers of the Association under the Act are a matter of statutory construction, not a question of fact, summary judgment in favor of the defendants on this point is appropriate.

c. *Equal Protection*

The *amicus* has raised an additional challenge to the Act's treatment of surplus lines insurers vis a vis admitted insurers on equal protection grounds. It claims that the Act is invidiously discriminatory against surplus lines insurers in two ways. First, the Act requires an initial $25,000 contribution as a condition of continued surplus lines eligibility, whereas admitted and authorized insurers are required to pay only a nominal license fee as a condition of doing business in the state, and are subject to more substantial assessments only in the event that an admitted or authorized insurer should become insolvent. Second, the Insurance law permits admitted and authorized insurers to impose policy surcharges on their insureds to recoup the amount of the assessment, whereas the Act provides no such recoupment mechanism for surplus lines insurers.

▮▮▮▮ The equal protection clause proscribes the differential classification of individuals similarly situated unless the classification bears a rational relationship to a legitimate state interest, assuming no fundamental right or suspect classification is involved. *San Antonio Ind. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16, *reh. denied,* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). Since the privilege of engaging in business in a state is not a fundamental right, differential assessments which are a precondition to the grant of such a privilege need only bear a rational relation to a legitimate state interest. *Cf. Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1973) ("Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the states have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation"). The equal protection clause "imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of taxation. The state may impose different specific taxes upon different trades and professions and may vary the rate of excise on various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value." *Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 526–27, 79 S.Ct. 437, 440–41, 3 L.Ed.2d 480 (1959). Although the assessments at issue here are not a tax, they are governed by a like standard under the equal protection clause.

▮▮▮▮ The state defendants present a plausible, legitimate state interest to which the one-time contribution requirement is rationally related. Since the immediate impetus behind the Act was to minimize the impact of Ambassador's impending financial collapse, the Legislature might well have determined that the Fund would require a quick infusion of monies from surplus lines insurers in order to meet the demand for payment on claims by Ambassador insureds. Over the long term, the Legislature could well have decided that the smaller surplus lines market would not be able adequately to meet the sudden demands of an insurer's insolvency with only post hoc assessments based on premium writings, but would require some base fund to draw upon. A legislative decision to establish a different contribution mechanism for the surplus lines fund than for the Association in light of these concerns would not be invidiously discriminatory or arbitrary, but rationally related to a legitimate state goal.

Moreover, the absence of a recoupment mechanism for surplus lines insurers makes eminent sense, given the absence of regulation on the upper limits of surplus lines premium rates. It is likewise not discriminatory. Because admitted and authorized insurers must seek approval for proposed rates and must not vary their rates once approved, N.J.Stat.Ann. 17:29A–7, 15, the only means by which they are able to recoup an assessment is by imposing a premium surcharge. Surplus lines insurers, with no equivalent rate rigidity, may simply raise their rates if they seek to recoup a contribution to the Fund. Neither the absence of an explicit recoupment mechanism, nor the requirement of an initial contribution thus discriminates unconstitutionally against surplus lines insurers.

### d. Contract Clause and Retroactivity

The *amicus* challenges the Act as a retrospective deprivation of vested rights. Plaintiffs claim it is a retrospective impairment of contract. The court agrees with the state defendants, however, that this legislation is not retrospective at all.

A piece of legislation is retroactive if its effect is "to impose a new duty or liability based on past acts." *Turner v. Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976). *See, e.g., Pension Benefit Guaranty Corp. v. Oregon-Washington Carpenters Employees Pension Trust Fund*, — U.S. —, 104 S.Ct. 271, 78 L.Ed.2d 253 (1984) (statute requiring employers who had withdrawn from Multiemployer Pension Fund in past to pay withdrawal liability fee). Such is not the case here. The "duty or liability" of surplus lines insurers to make the required contributions to the Fund is not based on the insurers' past participation in the surplus lines market, but on their continued participation. Insurers are free to withdraw from eligibility status and escape the assessments altogether. Indeed, the plaintiffs have conceded as much in their moving papers: "Surplus lines insurers should know before they accept risks exported to them whether they must choose to pay assessments or refuse to insure New Jersey risks." Plaintiffs' Mem. at 15. Only the measure of the required assessment is reflective of past participation in the surplus lines market, not the fact of the assessment. Because the Act calls for assessments based on continued eligibility status, rather than on past receipt of New Jersey business, it does not retrospectively disturb any vested rights, contrary to the *amicus'* claim.

Moreover, the Act has not "operated as a substantial impairment of a contractual relationship," *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 411, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569 (quoting cases), the threshold requirement for a contract clause violation. Surplus lines insurers had no "contract" with New Jersey to continue to receive in-state New Jersey business. Their eligibility status was not a "contract" right. Neither is there an impairment of these insurers' 1983 insurance contracts with New Jersey insureds because the legislation does not affect those contracts; it regulates only plaintiffs' continued eligibility to receive New Jersey business in the future. Plaintiffs' and *amicus'* contract and retrospective deprivation claims are thus unfounded.

### e. Taking Without Just Compensation

The final count in the complaint is that the borrowing provisions in the Act which authorize the Association to apply its own monies to the payment of claims against the surplus lines fund amounts to a taking of plaintiff Brody's property without just compensation. Plaintiff objects to the borrowing provision on the ground that it might leave his own potential claim unsecured, and that it provides for repayment to the Association at only a six percent annual rate of interest. Although the court has determined that plaintiff Brody, as an admitted insurer, has standing to challenge the Act's borrowing provision, the court concludes that this provision does not constitute a taking of plaintiff Brody's property. Brody's interest in the security and level of Association monies does not

**1316**

constitute "property" within the meaning of the fifth amendment's just compensation clause.

■ "Property" within the meaning of the just compensation clause is "the group of rights inhering in the citizen's relation to [a] physical thing." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945). It presupposes "the presence of a legally enforceable and recognizable interest in distinct property." *Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247, 1275 (7th Cir.1983). "Property" under the just compensation clause must consist of more than a mere contractual expectation. *Id.*

Plaintiff Brody's interest in Association monies does not rise even to that level, however. An insured's coverage under the Property Liability Insurance Guaranty Act is independent of, and not in proportion to, the insured's "contributions" to the Association through surcharges on his or her premiums. Coverage under the PLIG Act is a non-contractual benefit akin to the benefits provided in the federal Social Security Act. Such benefits enjoy no "constitutionally protected status," *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *see also Flemming v. Nestor*, 363 U.S. 603, 611, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960), as against the regulatory power of the government. While Brody may be entitled to procedural due process in the determination of his statutory eligibility to payment on a covered claim, *cf. Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), he has no vested right in coverage which would preclude the state from altering his eligibility. *A fortiori*, he has no immediate recognizable interest in distinct, identifiable monies held by the Association which might constitute "property" within the just compensation clause.

## CONCLUSION

The Surplus Lines Insurance Guaranty Fund Act is an important piece of remedial legislation designed to meet the crisis facing the state as a result of Ambassador's insolvency. The court finds no constitutional infirmity in the Act, and accordingly grants the defendants' motion for summary judgment.